UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| MONICA SCHMUTTE, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:05-cv-0311-LJM-WTL |
| | ) | |
| RESORT CONDOMINIUMS | ) | |
| INTERNATIONAL, LLC., | ) | |
| Defendant. | ) | |

## ORDER ON DEFENDANT'S MOTIONS TO STRIKE

This cause is now before the Court on defendant's, Resort Condominiums International,

LLC. ("RCI"), motions to strike that were incorporated into its reply brief on its pending Motion for

Summary Judgment.  Because the number of motions to strike was so large and disposition of them

critical to the Court's analysis on summary judgment, the Court chose to address the motions to

strike in a separate order.

For the reasons stated herein, all of RCI's motions to strike are **DENIED**.


### 1.   RCI's Objections to Paragraphs in Schmutte's Declaration

RCI has moved to strike numerous paragraphs in plaintiff's, Monica Schmutte's

("Schmutte") Declaration, contending that the statements contradict her prior deposition testimony,

are inadmissible hearsay, and/or are not based on personal knowledge.  When ruling on a motion for

summary judgment, the Court has the authority to strike any affidavit that does not conform to the

requirements of the Federal Rules of Civil Procedure.  *See Adusumilli v. City of Chi*., 164 F.3d 353,

359 (7th Cir. 1998).  "A party cannot create an issue of fact merely by manufacturing a conflict in

his own testimony by submitting an affidavit that contradicts an earlier deposition . . . ." *Piscione v. Ernst & Young*, 171 F.3d 527, 532 (7th Cir. 1999).  Moreover, "when a deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy." *Id.* (quoting *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67-68 (7th Cir. 1999)).  A party may attempt to clarify (but not contradict) prior deposition testimony through affidavits. *Simmons v. Chi. Bd. of Educ.*, 289 F.3d 488, 492 (7th Cir. 2002).  Ambiguities in a deposition must be resolved in favor of the non-moving party on summary judgment. *Aviles v. Cornell Forge Co.*, 183 F.3d 598, 602-03 (7th Cir. 1999).  Each objection is now addressed in turn.

   **a. Paragraph 15 of Schmutte's Declaration**—In paragraph 15 of her declaration, Schmutte testified:

> I believe that my manager, Jennifer Dickinson, reacted negatively to me taking intermittent leave.  When I had to inform Ms. Dickinson that I needed intermittent time off she sighed at me, or said "what is it this time?"  She also responded to me in an unfriendly voice, which was not like her because she was usually friendly towards me.

   RCI maintains that Schmutte's statements should be stricken because they are speculation and conjecture, contradict prior deposition testimony, and are remote in time.  RCI cites no authority for its proposition that Schmutte's statements are too remote in time to be considered.  In addition, Schmutte's statements are not speculation or conjecture. Schmutte can testify about what she believed based on her interactions with Dickinson.  Federal Rule of Evidence 701 ("Rule 701"), the rule which permits certain opinion testimony by lay witnesses, permits a witness to testify

concerning opinions that are "rationally based on the perception of the witness." Here, Schmutte testified as to what she observed Dickinson say and do that led her to believe that Dickinson was reacting negatively to her taking intermittent FMLA leave. This evidence meets the requirements of Rule 701.

Moreover, Schmutte's affidavit testimony does not conflict with her prior deposition testimony. During Schmutte's deposition, counsel for RCI introduced Schmutte's Initial Disclosure Statement. Dep. Schmutte, p. 172-173, Dep. Ex. 54. The following exchange then occurred:

> Q. Ms. Schmutte, I'm showing you what's been marked as Exhibit 54. This is a pleading that your attorneys have filed on your behalf in your lawsuit, or at least have served on us in your lawsuit. Have you seen this before?
>
> A. No.
>
> Q. They've provided us with some information that relates to the matters at issue in this case. I just want to ask you a couple of questions about their responses and see if you can provide me with your best information on those. First of all, they've identified people who have information that might be relevant to this case. I just want to walk through a couple of those names with you. Who's Jennifer [Dickinson]?
>
> A. Jennifer [Dickinson] is the supervisor over Shell Vacations Club. She was the supervisor over Shell Vacations Club.
>
> Q. What information would she have that would be relevant to your claims in this case, do you know?
>
> A. She would basically have information on any type of reviews, anything like that on me. As in this specific situation, the incident, I don't know.
>
> Q. Okay. She wasn't there on December 22nd?
>
> A. I don't remember.

Dep. Schmutte, p. 172-173, Dep. Ex. 54.

Schmutte's testimony from her deposition is not in conflict with Paragraph 15 of her

declaration.  In Schmutte's deposition she responded to a question asking for information Ms. Dickinson may have that would be relevant to Schmutte's claims.  Questioning Schmutte about "information" Dickinson may have would not prompt Schmutte to testify about conversations she had with Dickinson about her prior intermittent FMLA leave requests.  Moreover, RCI narrowed the line of questioning to the incident that occurred on December 22, 2003.  Schmutte would not know that she should testify about interactions she had with Dickinson in 2002, when RCI specifically referred to the events that occurred on December 22, 2003.

**b. Paragraphs 24-26 of Schmutte's Declaration—** In Paragraphs 24-26 of her declaration Schmutte testified as follows:

> 24.  I went to work on Thursday, September 18, 2003, and I told my co-worker Luanne Moore that I attempted suicide.  Ms. Moore informed our Team Leader, Lisa Ogborn about my suicide attempt.  Shortly thereafter, Gayla Jackson, the General Sales Manager, approached me at my desk and escorted me to the Human Resources Office.  Ms. Ogborn was also present.

> 25.  When we arrived at the Human Resources Office, Ms. Jackson, Ms. Ogborn, and I met with Brad Binder, the Manager of Human Resources, in his office.

> 26.  Mr. Binder told me that he was aware that I attempted suicide.  Mr. Binder suggested that I look into the counseling program offered to RCI employees.  I told Mr. Binder that I had suffered from depression for most of my life and that I was already in therapy and taking medication for my depression.

RCI maintains that because Schmutte testified in her deposition that she went to the St. Vincent's Stress Center the day after she attempted suicide, any events alleged to occur between her suicide attempt and Schmutte's admission to the Stress Center should be stricken.  With respect to her admission to the St. Vincent's Stress Center, Schmutte testified:

Q. Now, after this FMLA leave, do I understand that you subsequently, in the fall of

4

2003, had an FMLA leave again related to stress- -

A. Yes
.
Q. - - concerns? When did that FMLA leave start?

A. Would have started, I believe, September - - around September 17th.  I don't
- - I'm sorry, I don't remember the exact day. I know it was mid September [sic].

Q. Of 2003?

A. Yes, it was.

Q. And how long did it last?

A. Till November 22nd, around that date . . . .

Q. How did you end up going to the Stress Center and being placed in inpatient care
    there?

A. I tried to commit suicide.

Q. Do you know when that happened?

A. The night before I was admitted into St. Vincent's.

Dep. Schmutte, p. 82-83, 86.

Schmutte's deposition testimony and her affidavit testimony are not in conflict.  It is clear

that Schmutte was unsure in her deposition of the exact date that her September 2003, FMLA leave

began and was mistaken when she stated that she was admitted to the St. Vincent Stress Center the

day after she attempted to commit suicide.  Testimony from other witnesses indicates that Schmutte

did indeed have a conversation with Brad Binder, Gayla Jackson, and Lisa Ogborn regarding her

suicide attempt.  Both Ogborn and Jackson testified that a meeting occurred with Schmutte as a

result of her attempted suicide.  Dep. Ogborn, p. 44-46; Dep. Jackson, p. 24-26.  Ogborn testified

that Binder told Schmutte that everything was going to be okay and that she needed to go back

upstairs to work and get on the phone.  Dep. Ogborn, p. 45.  Schmutte's affidavit testimony serves

to clarify her prior deposition testimony.


     **c. Paragraph 36, Last Sentence of Schmutte's Declaration—** The last sentence in

paragraph 36 of Schmutte's declaration states, "CORE was responsible for communicating with RCI

about my medical leave."  RCI maintains that this sentence must be stricken because "Schmutte does

not have personal knowledge of CORE's responsibilities with respect to communications with RCI."

However, Schmutte can testify about her understanding of RCI's FMLA policy requiring employees

to make FMLA requests through CORE because she was an employee and was required to follow

the policy.  Moreover, documents produced by CORE and RCI during discovery in this matter show

that Schmutte communicated with CORE and CORE communicated with RCI.  Dep. D'Addario,

Ex. 1.


     **d. Paragraphs 38, 83-84, 94 of Schmutte's Declaration—** In Paragraph 38 of her

declaration, Schmutte testified as follows:  "38. To give me time to find a psychiatrist and not run

out of medication, Dr. Mishra and Dr. Osman gave me refills on my prescriptions for Klonopin and

Effexor EX.  Dr. Beard continued to prescribe Zoloft."

     RCI maintains that this paragraph must be stricken because Schmutte cannot diagnose herself

or conjecture about her physician's motives.  However, Schmutte does not diagnose herself in

Paragraph 38, she merely lists the medications she was taking.  Moreover, it is not conjecture for

Schmutte to testify about what she believes her physician's motives were.  Also, Schmutte can

testify, based on her personal knowledge, that she continued to take the medications prescribed by

Drs. Mischra, Osman, and Beard and that she continued to refill those medications while she looked for a psychiatrist.

RCI claims that Paragraphs 83 and 84 must be stricken because Schmutte allegedly was attempting to provide medical information on her certification forms and appeal letters which had not been provided by her doctors. In Paragraphs 83-84 and in Paragraph 94, Schmutte specifically quotes from the cover letter and appeal letter she submitted to CORE, which are Exhibits 17 and 20 attached to her declaration. RCI introduced these Exhibits during Schmutte's deposition. Schmutte is not "self diagnosing" with these Exhibits. Schmutte provided Declaration Exhibits 17 and 20 to CORE to evidence her attempts to appeal the denial of her FMLA request. Schmutte can attest to what her cover sheet and appeal letter stated, including the fact that she has been diagnosed with depression and anxiety, what she has been told by her physicians, and the symptoms she had experienced. Moreover, these statements are not hearsay because they are not made to prove the truth of the matter asserted; they show the communication that occurred between Schmutte and CORE.

Furthermore, RCI's objections to these Exhibits are contradictory given that RCI introduced Exhibits 40 and 45 at Schmutte's deposition, which according to RCI's analysis, would also contain the self-diagnosis and conjecture testimony that RCI now seeks to strike. Exhibit 40 is the paperwork that Schmutte faxed to CORE on January 8, 2004. Schmutte's paperwork included a fax coversheet, a cover letter, and the FMLA certification form. Schmutte's cover letter states, in part:

> This is in regards to the FMLA paperwork I have faxed along with this. I wanted to give you a brief explanation as to what happened. I had an adverse reaction to some anxiety medication I am on and basically collapsed at work . . . . I have contacted my doctor to inquire on changing my medicine . . . . I was a patient in the emergency room for 5-6 hours that day, making sure I didn't have any other medical problems

and was given some other medicine to counter-act my reaction.

*See* RCI's Summ. J. App., Ex. B, Dep. Ex. 40. Exhibit 45 to Schmutte's deposition is the paperwork that she faxed to CORE on January 22, 2004. RCI is hard pressed to argue that the Exhibits cited in Schmutte's declaration should be stricken where it relies on substantially similar Exhibits in its own motion for summary judgment.

**e. Paragraph 39 of Schmutte's Declaration—**In Paragraph 39 to her declaration, Schmutte testifies about a print-out she requested from her drug store. The print-out shows the dates on which Schmutte refilled her medications prescribed by Drs. Mishra, Osman, and Beard. RCI maintains that this paragraph and Exhibit must be stricken because Schmutte cannot authenticate the Exhibit and because "they are inadmissible hearsay." Schmutte can attest to the medication she was prescribed by her physicians and that she was given refills on the medication. Schmutte can also attest to the fact that she had to refill her medications from time to time during 2003, and January 2004, at the CVS pharmacy.

Schmutte can authenticate the print-out that she received from the drug store. With respect to authentication, the proponent of the proffered evidence need only make a prima facie showing that the exhibit is what the proponent claims it is. *See United States v. Kelly*, 14 F.3d 1169, 1175 (7th Cir. 1994). Here, Schmutte testified that she requested a print-out from the drug store where she had her prescriptions filled during 2003, and January 2004. Schmutte attached a true and correct copy of her prescription print-out from the CVS pharmacy. There is no reason to doubt that what is attached to Schmutte's declaration is not the print-out that she received from the CVS pharmacy. Thus, Schmutte has made a prima facie showing of authenticity.

8

**f. Paragraph 42 of Schmutte's Declaration**— In Paragraph 42 of her declaration, Schmutte

stated:

> I did not apply for intermittent FMLA leave when I returned to work in November 2003 because I had been off work for seven (7) weeks and felt obligated to return full time. Additionally, I did not apply for intermittent leave because I did not believe that RCI would approve such a request based on Ms. Dickinson and Ms. Burtzlaff's reaction to my prior intermittent leave request.

RCI maintains that this affidavit testimony must be stricken because it contradicts Schmutte's

deposition testimony. During her deposition, Schmutte testified as follows:

> Q. Okay. And did you understand that following November 12, 2003, that you had been released to return to work without restrictions?
>
> A. Yes. I asked for - - to return without restrictions. Because I, again, felt that I needed to get back to work. I felt guilty for being off.
>
> Q. And you knew that intermittent leave was potentially available, but you opted not to seek it; is that a fair statement?
>
> A. At that - - at that point in time, yes. I - - a few reasons. I wasn't sure what - - how many hours I had left on FMLA. Again, I looked at it as being off for two months. I felt that I would be competent enough to go back and handle the work life. I guess you would say.
>
> Q. Had you tracked the amount of FMLA time you had taken in 2003?
>
> A. No.
>
> Q. Did you ever ask anybody how much time you had left?
>
> A. No. I knew that the only time I took was from my surgery in May, and then, from this. So, I knew that I had the time, I just didn't know - - once you add it up, of how much time I had left, or whatever.
>
> Q. Okay. Why don't we take a break.

Dep. Schmutte, p. 88-89.

Schmutte testified in her deposition that she did not request intermittent leave when she

9

returned in November 2003 for "a few reasons."  RCI did not follow-up in order to explore all of Schmutte's reasons not to apply for intermittent leave when she returned.  RCI stopped this line of questioning and went on to question Schmutte about a different matter.   Thus, Schmutte's declaration is not inconsistent with her deposition testimony.

**g. Paragraphs 44-47, 51 (Sentences 6-7) of Schmutte's Declaration—** With respect to paragraphs 44-47, 51 (Sentences 6-7), RCI maintains that Schmutte's affidavit testimony regarding her conversations with Lisa Ogborn contradict her prior deposition testimony.  In response to questions regarding Deposition Exhibit 54, Schmutte's deposition testimony reflects the following exchange:

> Q. And I'll ask - - to try to move this along, I'll ask sort of a broader question, and maybe we can just jump through it.  But have we – we've listed – or, in this pleading is listed Brad Binder, Lee Watts and Lisa Ogborn and Everett Lanham. Have we talked about everything that those individuals have that are relevant to your claims in this case?
>
> A. Yes.
>
> Q. And have we covered all the conversations that you've had with those individuals that would related to your incident on December 22nd and your claims for - -
>
> A. Yes.
>
> Q. - - FMLA leave?
>
> A. Yes.

Dep. Schmutte, p. 172-174.  A broad question relating to Schmutte's Initial Disclosure Statement is not sufficient to prompt Schmutte to describe every conversation she had with Lisa Ogborn. Asking a witness what information another person may have is not the same as asking the witness

what conversations she has had with the other person.  Moreover, with respect to conversations with supervisors, Schmutte's full testimony reveals:

> Q.  Had you talked with any of your supervisors at RCI after you came back from the Stress Center about your medical status, the status of your treatment for stress?
>
> A.  I would talk to Lisa periodically.  I don't remember exactly what all was said.  Again, Lisa was my team lead, but she was also like a friend that I could talk to, so she knew- -
>
> Q.  Sort of confidential conversation?
>
> A.  Yeah.  Yeah.
>
> Q.  Anybody else that you talked to on a more formal basis about your condition- -
>
> A.  Not
>
> Q.  - - at RCI?
>
> A.  - - besides my friend, Luanne, no actual supervisors, or anything, no.

Dep. Schmutte, p. 116-117.  RCI never followed-up with Schmutte about what conversations she had with Lisa Ogborn.  Moreover, RCI never asked Schmutte to explain what Ogborn "knew."  Instead, RCI proceeded with a different line of questioning.  Schmutte's affidavit testimony that expounds on her conversations with Ogborn does not contradict her deposition testimony.

Furthermore, during her deposition, Schmutte did attempt to testify about the issues she was having with her panic attacks.  RCI chose not to question Schmutte.  Schmutte testified:

> Q.  Ms. Schmutte, I'm showing you Exhibit 25.  It is a one-page exhibit.  Is that your signature at the bottom?
>
> A.  Yes, it is.
>
> Q.  Dated December 2, 2003?
>
> A.  Yes, it is.

11

Q. There's some typed questions, and then, there's some written responses on this
form.  Was that - - are those written responses your handwriting?

A. Yes, they are…

Q. And then, it says: What will you do differently to improve your attendance.  Do
you see that?

A. Yes.

Q. And you say: Stay at work as much as possible. And then you say: Not leave early.
Was leaving early a problem?

A. I did have some issues with that at work, yes.  I would have panic attacks at work,
and just the work environment was at that time very stressful for me.

Dep. Schmutte, p. 51-54, Dep. Ex. 25.

RCI did not question Schmutte about the panic attacks she had at work.  Additionally, RCI

knew that the panic attack causing Schmutte to go to the hospital occurred on December 22, 2003,

so RCI should have known that Schmutte was not referring to the same panic attack when she was

testifying about a document dated December 3, 2003.  In her deposition, Schmutte referenced more

than one panic attack.  She specifically testified about having "panic attacks at work."  RCI never

questioned Schmutte about her panic attacks.  Moreover, this deposition testimony is consistent with

Schmutte's affidavit testimony where Schmutte testified that she left work early on November 23,

2003, and December 1, 2003, because she had panic attacks at work.

Finally, Schmutte can attest to the fact that Lisa Ogborn expressed concerned about how job

stress might affect Schmutte's performance. This statement is made based on Schmutte's personal

knowledge.

**h. Paragraph 63 of Schmutte's Declaration—** RCI contends that Paragraph 63 of Schmutte's declaration contradicts her deposition testimony. RCI's alleged contradiction is nothing more than Schmutte's misuse of pronouns. Schmutte testified in paragraph 63 of her declaration:

> Later in the day Dr. Beard's nurse called me and said that they were having difficulty filling out the certification form. The nurse said that by looking at the form they did not know which box to check. I told the nurse that I was going to call CORE and ask them what to do.

In Schmutte's deposition, RCI introduced Deposition Exhibit 52, records from Dr. Beard's office. The following line of questioning followed:

> Q. Ms. Schmutte, I'm showing you a document that was produced by Dr. Beard's office to us. And in particular, I want to direct your attention to the third page. I wonder whether you - - have you seen any of these documents?
>
> A. No, I haven't.
>
> Q. Okay. I just want to ask, and you may not have knowledge of this, but there's a handwritten note on the third page that says: Why was she in meth, question mark. And it says: If psych, episode of anxiety, had shot of Xanax. And then, it says: Psych needs to fill out FMLA. And then, it looks like the initials of Dr. Beard. Did you have any discussion with anyone in Dr. Beard's office about someone else needing to fill out your FMLA paperwork?
>
> A. No.
>
> Q. Does that ring a bell with you at all in terms of any contact you had with Dr. Beard's office?
>
> A. I spoke with her nurse, and she called to find out exactly what happened. And she was looking over it, and she goes, well, I'll have to just call CORE, then, to find out what box I need to select on the form that she had. But they never informed me that I would need to speak with anyone else.

Dep. Schmutte, p. 165-167.

Schmutte's deposition testimony indicates that during her conversation with Dr. Beard's nurse, the nurse was looking over the FMLA form and told Schmutte that she (Schmutte) would have

to call CORE to find out what box Schmutte needed to select on the form.  This testimony does not contradict Schmutte's affidavit testimony.

**i. Paragraph 64 of Schmutte's Declaration—** RCI maintains that Paragraph 64 of Schmutte's declaration, which describes conversations Schmutte had with Dr. Beard's nurse and CORE representatives, should be stricken because Schmutte omitted this information from her deposition testimony and because it is contradictory to Schmutte's statement in her deposition.  RCI is responsible for asking the deposition questions.  Schmutte is not responsible for providing RCI with information where RCI made no effort to question Schmutte about the conversation.  Thus, Schmutte should not be faulted for omitting this conversation from her deposition testimony.

Moreover, Schmutte's testimony in response to RCI's questions about Schmutte's Initial Disclosure Statement does not contradict Paragraph 64.  RCI asked Schmutte whether Dr. Beard was her family physician and then asked, "We've covered everything that she has that would be relevant to your claims?"  Schmutte's testimony in paragraph 64 of her declaration relates to a conversation she had with CORE and a conversation she had with Dr. Beard's nurse.  Testimony about information that Dr. Beard may have does not contradict testimony concerning conversations with individuals other than Dr. Beard.

RCI also maintains that the statements made in Paragraph 64 are inadmissible hearsay.  Rule 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Not all out-of-court declarations amount to inadmissible hearsay.  An out-of-court statement offered to establish a statement was made and it had an effect on the listener is not contrary to the general hearsay rule.

14

*See Foo v. Trustees of Ind. Univ.*, 88 F.Supp. 2d 937, 942 (S.D. Ind. 1999) ("If the statement were being offered for the truth of the matter asserted, it would be inadmissible hearsay. But the court finds that this statement is nonhearsay, offered to show its effect on the listener."); *see also Cooper-Schut v. Visteon Auto. Sys.,* 361 F.3d 421, 430 (7th Cir. 2004). Rule 803(3) sets forth the "state of mind" hearsay exception. *See, e.g.*, *United States v. Linwood,* 142 F.3d 418, 424-425 (7th Cir. 1998); *Foo v. Trustees,* 88 F.Supp. 2d at 942. "Offering testimony to establish background facts leading up to a sequence of events is likewise an ostensibly non-hearsay use of evidence." *United States v. Akinrinade*, 61 F.3d 1279, 1282 (7th Cir. 1995).

Schmutte's statements in Paragraph 64 are not offered for the truth of the matter asserted. The statements are asserted to show the effect on the listener. Schmutte contacted CORE because she was instructed to do so by Dr. Beard's nurse. Thereafter, as a result of Schmutte's conversation with the CORE representative, Schmutte contacted the nurse at Dr. Beard's office regarding the FMLA form. Schmutte's testimony is admissible.

**j. Paragraph 70, Third through Last Sentence of Schmutte's Declaration**—In Paragraph 70 of her Declaration, Schmutte testified:

> On Monday, January 12 or Tuesday, January 13, 2004, I contacted CORE to inquire about the status of my leave request. The person I spoke with told me that my FMLA request was denied because I did not have a serious health condition. The person did not tell me that my certification form was insufficient, inadequate or incomplete. The person did not ask me to have my doctor provide more information. The person also never told me that I could appeal the denial of my leave request and that there was an appeal deadline. I never received anything in writing from CORE informing me that my FMLA request had been denied or advising me of my appeal rights.

RCI maintains that the third through the last sentences should be stricken because Schmutte does not

remember enough of the conversation.  RCI bases this contention on the following exchange during Schmutte's deposition:

Q. And Kelly told you your request had been denied?

A. Right.

Q. Did she tell you why it had been denied?

A. It was not considered a serious medical condition.

Q. What did you say?

A. I don't believe I said anything. I just said, okay.

Q. What was that—

A. I don't remember asking any questions, or anything.

Dep. Schmutte, p. 119.

Schmutte testified during her deposition that she believes that she spoke with Kelly at CORE on January 12, 2004, and that Kelly told her that her request was denied because it was not considered a serious health condition.  Dep. Schmutte, p. 118-119.  Schmutte also testified that she did not remember asking any questions.  *Id*.  RCI did not ask Schmutte whether Kelly did or did not tell her that the FMLA form was insufficient, incomplete, or inadequate.  RCI did not ask Schmutte whether Kelly did or did not ask her to have her doctor provide more information.  Schmutte's affidavit testimony does not contradict her deposition testimony.  Schmutte cannot respond to questions that RCI failed to ask.

Furthermore, Schmutte also testified during her deposition:

Q. When you talked to the CORE representative on January 12th - -

A. Uh-huh.

16

> Q. - - did you ask about filing an appeal, or did the representative say anything about a mechanism for filing an appeal?
>
> A. She never mentioned an appeal.  I never knew anything about an appeal for the fact that the other times I've been approved with no problem, so I didn't know of an appeal process.

Dep. Schmutte, p. 122.  Schmutte also testified that she did not receive the letter sent by CORE stating that she could appeal the FMLA denial:

> Q. Ms. Schmutte, I'm showing you what's been marked as Exhibit No. 41.  Would you take a moment to look at that and tell me if you recognize that document.
>
> A. (Complying.) I do not.
>
> Q. And did you receive this document from CORE?
>
> A. No.
>
> Q. At any point in time?
>
> A. No.

Dep. Schmutte, p. 133-134.  Schmutte's Declaration testimony does not contradict this deposition testimony.

**k. Paragraph 78, Last Sentence of Schmutte's Declaration—** In Paragraph 78 of her declaration, Schmutte testified:

> I was terminated on January 20, 2004.  At that time the only correspondence I had received from CORE was the January 5, 2004 correspondence that I received on January 12 or 13, 2004.  This was the first time that termination was ever mentioned as a possibility.

RCI contends that the last sentence in Schmutte's declaration contradicts her deposition testimony.  RCI points to the following deposition testimony for this contention:

Q. Ms. Schmutte, I'm showing you now Exhibit 26. Is that your signature on the third page?

A. Yes, it is.

Q. And this one is signed by Lisa Ogborn, correct?

A. Yes.

Q. Dated December 15, 2003?

A. Yes.

Q. And this, as I understand it, is it a final written warning you received on that date?

A. Yes, it was.

Q. And you had 2 points remaining?

A. Yes.

Q. And you understood that the next disciplinary action that could occur would be termination?

A. Yes.

Dep. Schmutte, p. 54-55. While RCI relies on this testimony to support its argument, it fails to include the fact the Schmutte testified that on December 22, 2003, Watts told Schmutte that her job was safe. Schmutte testified as follows:

A. …I remember someone saying that - - that I should go to the hospital so I could get checked out. And I remember telling them that I can't go to the hospital, I - - I can't lose my job. And at that point in time, I remember Lea Watts saying that - - not to worry, that my job is safe, that I need to just worry about going to the hospital and getting better…

Dep. Schmutte, p. 92-93. Schmutte also testified:

Q. So, after you returned to work the next day, when did you first discuss with anyone at RCI how you might protect the absence occurrence that had taken place on December 22nd?

18

A. That day.

Q. Who did you talk to?

A. I - -

Q. So, this is December the 23rd?

A. Yes.

Q. Who did you talk to?

A. I originally went to Lisa Ogborn, and she referred me to Everett Lanham.

Q. And who is Everett Lanham?

A. Everett Lanham was the attendance coordinator. He was filling in for a Kathleen Kestner while she was on maternity leave.

Q. Did you talk to Mr. Lanham?

A. Yes.

Q. What day did you talk to Mr. Lanham?

A. The next day.

Q. The 23rd of December?

A. Yes…

Q. Okay. What was said in that conversation?

A. He said - - I basically informed him of what happened, and I said that - - I informed him of what I was told by [Watts] and what I needed to do with my time card on filling this out.  And he said that he would look into it and he'd get back with me.

(Dep. Schmutte 101-103). Schmutte further testified about the day that she was terminated:

Q. Okay. And then, what happened on the day that you were terminated?  Can you describe what happened that day?

19

A. Well, I came to work.  On my first break, I went downstairs to the cafeteria to get a pretzel and a Coke and came back upstairs.  And as soon as I sat down and was about to eat my pretzel, they called me downstairs.  And at that point in time was when Brad Binder terminated me.

Q. And what did he say to you when he terminated you?

A. Went over the attendance policy and showed me the warning that I had.  And basically, just explaining that - - with you going down to zero points, with RCI's policy, you are terminated.  I brought up the conversation - - not conversation.  I brought up what happened when I passed out and mentioned what Lea Watts has said, and I gave him Luanne's name as a witness to what she said.  And he basically said he would get - - he'll talk to [Watt's] to find out exactly what was said.  And I left.  They had everything packed up and [sic] went home.

Dep. Schmutte, p. 138-139.

Schmutte's deposition testimony shows that Schmutte knew where she stood as far as attendance points.  However, her deposition testimony also shows that Schmutte did not believe that she would be terminated as a result of being taken to the hospital on December 22, because Lea Watts told her that her job was safe.  Thus, Schmutte's declaration that the date of her termination was the first time termination had been mentioned in relation to her December 22 absence does not contradict her deposition testimony.

**l. Paragraph 89, Fourth through Last Sentence—** In Paragraph 89 of her declaration, Schmutte testified:

On January 26, 2004, I called CORE to check on the status of my appeal.  I was informed by a person named Sharon that my appeal was denied.  I then asked to speak with a supervisor.  Sharon transferred me to Cheryl.  Cheryl told me that my appeal was denied because the appeal deadline had expired and because my absence was not considered a serious health condition.  I told Cheryl that I never received anything in writing stating that I could appeal the denial.  Cheryl told me that a letter sent on January 12, 2004, which I did not receive, gave me five (5) days to appeal the denial.  Cheryl also said that if my family doctor had mentioned anything about me

20

having an anxiety attack CORE would have approved the FMLA request no matter what.  I told Cheryl that the first certification form I submitted provided that I was taking medication for anxiety so I assumed they understood that I had anxiety. Cheryl said that description was not sufficient.  I believe that Cheryl also told me that my therapist was not a qualified health care provider.

RCI argues that the fourth through last sentences contradict Schmutte's deposition testimony.  RCI

also argues that the testimony is inadmissible hearsay.

During her deposition Schmutte testified:

Q. . . .  Had anyone informed you that your appeal letter was due on January 18, 2004?

A. No, they did not give me a specific date.  They just said it was past the appeal date . . . .

Q. Okay. Now, between the time that you talked to Jamie on January 22, 2004, and confirmed that she had received your new certification - -

A. Uh-huh.

Q. - - submission and your receipt of this Exhibit 46, had you had any contact with anyone at CORE about your FMLA?

A. Yes.

Q. What contact had you had?

A. I don't remember the names. I don't have it on me here. Kim does have all the information.  I know that I probably have spoke with someone possibly every other day.  I'm just - - right now I know that I called them again on the 23rd to find out what - - what their decision was on the 22nd information.  I know at that point in time they said, well, the therapist that filled it out is not considered a provider to - - I don't remember exactly the words on that.  So, I went back and had the licensed social worker in that same office sign it, as well, since she was - - she's aware of my condition, and sent that back in to them.  And I think I called on the next day to check on that…

Dep. Schmutte, p. 152-155.

In reference to Deposition Exhibit 47, a fax verification form with Schmutte's handwriting,

21

Schmutte testified:

Q. So, 1/26/04, called CORE, Sharon trans to Cheryl - -

A. Right.

Q. - - that's your handwriting?

A. Yeah, Sharon transferred me to Cheryl.

Q. So, who is Sharon?

A. Sharon was the representative I spoke to on the phone.

Q. On January 26th?

A. Right. Cheryl is the manager - - she's the manager.  I don't remember if she's the manager over the Appeal Department or just a manager in her office.

Q. She's a more senior person - -

A. Yes.

Q. - - at CORE as you understood it?

A. Yes.

Q. Do you know what either of their last names are?

A. No.

Q. Did you talk to Cheryl then?

A. Yes.

Q. What was your - - first of all, what was your conversation with Sharon on January 26th, if you can recall?

A. I - - honestly, I don't recall. I mean, basically, it's just inquiring on the appeal of what has been determined, but, I mean, I can't remember exactly what would have been said.

Q. And what did Cheryl say to you when you talked to her?

A. For this particular conversation on the 26th, I'm sorry, I don't remember.

Q. Is it possible that these were the conversations in which you were told that your therapist was not a medical provider eligible to fill out the certification form?

A. It may have been at that time.

Dep. Schmutte, p. 152-155.

During Schmutte's deposition, RCI introduced Deposition Exhibit 64, a copy of the CORE note pad with the notes of conversations between Schmutte and CORE. With respect to this Exhibit Schmutte testified:

Q. Ms. Schmutte, I'm showing you what's been marked as Exhibit 64, a four-page exhibit. Could you take a moment to look at that?

A. (Complying) Okay.

Q. Have you seen this document before?

A. No, I have not.

Q. Okay. So, this is not something you have gone over with your attorney?

A. No.

Dep. Schmutte, p. 200-201. RCI then asked Schmutte a few questions about the Exhibit, but did not go through each entry with Schmutte. Dep. Schmutte, p. 200-203.

After her deposition, Schmutte reviewed the CORE notepad, which refreshed her memory about the conversations she had with the CORE representatives. Schmutte's Summary Judgment Appendix includes a copy of the CORE notepad. *See* Exhibit 11 (Excerpts from Deposition of Jeanette D'Addario), Exhibit 1, pages CORE000012-17. According to CORE's notepad, the discussion Schmutte had with CORE on January 26, 2004, was as follows:

1/26/2004 01:15 P.M. created by SHARYN CASSELL

23

TCF EE checking on claim. Advised EE that her appeal for FMLA has been denied. EE requests to s/w and FMLA supervisor. Transferred EE to Cheryl @ 3059.

<u>1/26/2004 01:24 P.M. created by CHERYL SIKORA</u>
p/c with Ee regarding her denial. Informed the Ee with the information on the cert form it was not considered a serious health condition and the person who completed the Family Cert form was not a qualifying provider. I did indicate to the EE if the doctor (PCP who completed the first cert form) indicated the absence was due to a anxiety episode and it was a serious health condition, we would have indeed approved the absence. I also indicated her appeal process was 1/18/2003 (sic) and we did not receive her appeal and medical information until 1/21/2004.  She asked if there was anything that she could do I stated "no" it would now be up to Cendant and I do believe they would refer her back to CORE. I informed her I just reviewed her Family Certification form with the Adjudicator and all decisions CORE made were correct. Ee stated okay and call ended.

Dep. D'Addario, Ex. 1, p. CORE000015-16.

Schmutte's lack of recollection of her conversation with Cheryl during her deposition is not inconsistent with her declaration.  After her deposition, Schmutte reviewed the notepad, which had been introduced at Schmutte's deposition by RCI, and Schmutte's memory was refreshed.  RCI could have questioned Schmutte about all of the conversations recorded in the notepad, but chose not to. Schmutte's affidavit testimony also places her deposition testimony into context and clarifies her prior deposition testimony.  *See Simmons v. Chi. Bd. of Educ.*, 289 F.3d 488, 492 (7th Cir. 2002) (A party may attempt to clarify (but not contradict) prior deposition testimony through affidavits).

Finally, Schmutte's testimony in Paragraph 89 regarding what Cheryl told her is not inadmissible hearsay.  Schmutte's statements are not offered to prove the truth of the matter asserted. The testimony is put forth to show the effect on the listener.  As a result of her conversation with Cheryl, Schmutte went back to her therapist's office and had her certification form signed by a licensed social worker.  She then faxed the certification form back to CORE.

**m. Paragraph 102, Third through Last Sentence, and Paragraph 103 of Schmutte's Declaration—** In Paragraphs 102 and 103 of her declaration, Schmutte testified:

102.   In late February 2004 or early March 2004, I contacted the Department of Labor to file a complaint regarding my termination. The investigator looking into my complaint was Steve Garrett. Mr. Garrett investigated my complaint from late February 2004 or early March 2004 until August 2004. Mr. Garrett told me that RCI had violated the FMLA. Mr. Garrett said that he was going to try to settle my complaint against RCI.

103.   Mr. Garrett tried to resolve my complaint with RCI but he told me that RCI was not interest in reinstatement and offered to resolve my complaint for only $100.00.

RCI maintains that the third through last sentence of Paragraph 102 and all of Paragraph 103 must be stricken because the testimony is inadmissible hearsay. Schmutte's testimony is not offered to prove the truth of the matter asserted, rather it is offered to show its effect on the listener. As a result of Mr. Garrett's statements to Schmutte, Schmutte decided to drop her FMLA complaint filed with the Department of Labor ("DOL") and pursue a lawsuit against RCI.

## 2. RCI's Objections to Dr. Mishra's Deposition Excerpts

RCI objects to the excerpts from the deposition of Dr. Sanjay Mishra as not relevant to the issues in this case because Schmutte "has presented no evidence that any decisionmaker with respect to [Schmutte's] request for FMLA leave to cover her December 22, 2003, absence, or any decisionmaker with respect to her termination, possessed the information contained in these excerpts." RCI maintains in this lawsuit that Schmutte does not suffer from a serious health condition. Schmutte is entitled to put forth evidence establishing that she does, indeed, suffer from a serious health condition. Dr. Mishra's cited testimony is relevant to establish that Schmutte suffers

from a serious health condition.

In addition, Dr. Mishra's testimony relates to his treatment of Schmutte at the St. Vincent's Stress Center in September 2003, when Schmutte was on FMLA leave.  RCI recognized this leave as covered by the FMLA.  Accordingly, this evidence related to Schmutte's condition, which RCI has recognized as FMLA-qualifying.


### 3. <u>RCI's Objections to the Declaration of Kim Papanikandros</u>

RCI's objects to the Declaration of Papankikandros as not relevant to the issues in this case because Schmutte "has presented no evidence that any decisionmaker with respect to [Schmutte's] request for FMLA leave to cover her December 22, 2003, absence, or any decisionmaker with respect to her termination, possessed the information contained in these excerpts."  Again, RCI contends in this lawsuit that Schmutte does not suffer from a serious health condition.  Papanikandros' declaration and attached exhibits support Schmutte's argument that she does suffer from a serious health condition.  Moreover, the documents attached to Panpanikandros' declaration are documents that were sent by Schmutte's health care provider to CORE, RCI's agent, for the purpose of handling FMLA leave requests from RCI's employees.  RCI contracted with CORE to be the administrator of its FMLA leave policy.  RCI cannot claim that the documents submitted to CORE between September and November 2003, in connection with Schmutte's FMLA leave have no relevance when its agent requested the documents from Schmutte's medical providers and received the documents to support Schmutte's request for FMLA leave.

### 4. <u>RCI's Objections to the Declaration of Kimberly Jeselskis</u>

Exhibit 8 in support of Schmutte's Response to RCI's Motion for Summary Judgment is a declaration signed by Kimberly Jeselskis. The purpose of the declaration is to identify Exhibits 1-7 attached to the declaration.

**a. Exhibit 1: File from the DOL**— RCI objects to the submission of the file from the DOL as "unauthenticated" and "inadmissible hearsay." "The requirement of authentication…as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." FED. R. EVID. 901(a). Generally speaking, the proponent of the proffered evidence need only make a prima facie showing that the exhibit is what the proponent claims it is. *See United States v. Kelly,* 14 F.3d 1169, 1175 (7th Cir. 1994). Circumstantial evidence is sufficient to establish the authenticity of a document. *United States v. Clark*, 649 F.2d 534, 542 (7th Cir. 1981). The proponent may establish authenticity by showing that the "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances" indicate that the evidence is what he purports it is. FED. R. EVID. 901(b)(4). The proponent may also establish authenticity through testimony of a witness with knowledge "that a matter is what it is claimed to be." FED. R. EVID. 901(b)(1). A public record or report can be authenticated if it is authorized by law to be recorded or filed and it is in fact recorded or filed in a public office, or a purported public record, report, statement, or data compilation can be authenticated if it "is from the public office where items of this nature are kept." FED. R. EVID. 901(b)(7). When a party has produced the document in question in response to a subpoena or discovery request, he has implicitly authenticated the document. *United States v. Lawrence*, 934

F.2d 868, 871-72 (7th Cir. 1991); *In re Greenwood Air Crash*, 924 F.Supp. 1511, 1514 (S.D. Ind. 1995). Additionally, authentication is not required for official publications "purporting to be issued by public authority." Fᴇᴅ. R. Eᴠɪᴅ. 902(5).

Exhibit 1 is the file from the DOL regarding the FMLA complaint that Schmutte filed against RCI with the DOL. Jeselskis testified that she has personal knowledge that Exhibit 1 is a true and correct copy of the DOL file. This is a prima facie showing of authenticity. *See* Fᴇᴅ. R. Eᴠɪᴅ. 901(b)(1) (stating that testimony of a witness with knowledge meets the authentication requirement set forth in Rule 901(a)); *Sprinkle v. Lowe's Home Ctrs., Inc.*, 2006 U.S. Dist. LEXIS 49203 at *3-6 (S.D. Ill. 2006).

Additionally, the first page of Exhibit 1 shows that the DOL file is the official file that was produced pursuant to the Freedom of Information Act. This satisfies the authentication requirement pursuant to Rules 901(b)(7) and 902(5).

Moreover, the file is authenticated because a copy of the DOL file was produced during discovery in this matter. *See United States v. Lawrence*, 934 F.2d 868, 871-72 (7th Cir. 1991); *In re Greenwood Air Crash*, 924 F.Supp. 1511, 1514 (S.D. Ind. 1995).

Finally, Exhibit 1 is not inadmissible hearsay. Rule 803, which provides exceptions to the general hearsay rule, states that "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth . . . the activities of the office or agency" "are not excluded by the hearsay rule, even though the declarant is available as a witness." Fᴇᴅ. R. Eᴠɪᴅ. 803(8). The DOL file is a public record or report of a public office or agency which sets forth the activities of the office or agency and is, thus, admissible pursuant to Rule 803(8).

**b. Exhibits 2-3: Documents Produced Pursuant to Subpoena and Non-Party Request for Production of Documents—** RCI objects to the submission of documents produced by CORE pursuant to a subpoena and non-party request for production of documents.  Like the DOL file, Jeselskis testified that she has personal knowledge that Exhibit 2 is a true and correct copy of the Subpoena and Non-Party Request for Production served on CORE, and Exhibit 3 is the documentation produced by CORE in response to Exhibit 2.  This is a prima facie showing of authenticity.  *See* FED. R. EVID. 901(b)(1); *Sprinkle v. Lowe's Home Ctrs., Inc.*, 2006 U.S. Dist. LEXIS 49203 at *3-6 (S.D. Ill. 2006).

In addition, the documents making up Exhibit 3 were produced to Schmutte and RCI during the course of discovery in this lawsuit.  *See United States v. Lawrence*, 934 F.2d 868, 871-72 (7[th]Cir. 1991); *In re Greenwood Air Crash*, 924 F.Supp. 1511, 1514 (S.D. Ind. 1995).  In fact, RCI insisted on reviewing the documents before CORE made a production to Schmutte.

Exhibit 3 is not inadmissible hearsay.  The Exhibit falls within Rule 803(6), the hearsay exception for records of regularly conducted activity.

**c.  Exhibits 4-5: Medical Documents from St. Vincent's Stress Center Produced Pursuant to a Medical Release—** During the course of this lawsuit, RCI specifically requested copies of Schmutte's medical records.  The parties narrowed the scope of RCI's request to include the medical records from Schmutte's treatment at the St. Vincent's Stress Center.  Jeselskis testified that she has personal knowledge that Exhibit 4 is a true and correct copy of the Medical Release sent to St. Vincent's Stress Center, and Exhibit 5 is the documentation produced by St. Vincent's Stress Center in response to Exhibit 4.  This is a prima facie showing of authenticity.  *See* FED. R. EVID.

901(b)(1); *Sprinkle v. Lowe's Home Ctrs., Inc.*, 2006 U.S. Dist. LEXIS 49203 at *3-6 (S.D. Ill. 2006).   In addition, the documents making up Exhibit 5 were produced to RCI during the course of discovery in this lawsuit in response to RCI's discovery requests.  *See United States v. Lawrence*, 934 F.2d 868, 871-72 (7th Cir. 1991); *In re Greenwood Air Crash*, 924 F.Supp. 1511, 1514 (S.D. Ind. 1995).

Exhibit 5 is not inadmissible hearsay.  The Exhibit falls within Rule 803(6), the hearsay exception for records of regularly conducted activity.   Additionally, Schmutte can submit this evidence in support of her argument that she suffers from a serious health condition.

**d. Exhibits 6-7: Medical Documents from Methodist Hospital—**During the course of this lawsuit, RCI specifically requested copies of Schmutte's medical records.  The parties narrowed the scope of RCI's request to include the medical records from Schmutte's treatment at the Methodist Hospital emergency room.  Jeselskis testified that she has personal knowledge that Exhibit 6 is a true and correct copy of the Medical Release sent to Methodist Hospital, and Exhibit 7 is the documentation produced by Methodist Hospital in response to Exhibit 6.  This is a prima facie showing of authenticity.  *See* FED. R. EVID. 901(b)(1) In addition, the documents comprising Exhibit 7 were produced to RCI during the course of discovery in this lawsuit in response to RCI's discovery requests.  *See United States v. Lawrence*, 934 F.2d 868, 871-72 (7th Cir. 1991); *In re Greenwood Air Crash*, 924 F.Supp. 1511, 1514 (S.D. Ind. 1995).

Exhibit 7 is not inadmissible hearsay.  The Exhibit falls within FRE 803(6), the hearsay exception for records of regularly conducted activity.   This evidence also supports Schmutte's argument that she suffers from a serious health condition and is relevant for that purpose.

**5. RCI's Objections to Carla Sander's Deposition Excerpts**

RCI objects to Ms. Sander's deposition testimony as inadmissible hearsay.  However, the testimony is not offered in evidence to prove the truth of the matter asserted.  Ms. Sander's testimony is offered to show its effect on the listener.  Ms. Sander's testimony reflects how she reacted to the information provided to her by the DOL investigator.  She testified that she questioned him about what CORE could have done better.  She also testified that after speaking with the DOL investigator about his findings, CORE did not reverse the decision to deny Schmutte's FMLA request.  Thus, Ms. Sander's testimony is not inadmissible hearsay.

**CONCLUSION**

For the foregoing reasons, the Court holds that the Defendant's Motions to Strike are **DENIED.**

IT IS SO ORDERED this 29th day of November, 2006.

LARRY J. MCKINNEY, CHIEF JUDGE
United States District Court
Southern District of Indiana

Electronically distributed to:

Kimberly Denise Jeselskis
MACEY SWANSON AND ALLMAN
kjeselskis@maceylaw.com

Barry A. Macey
MACEY SWANSON AND ALLMAN
bmacey@maceylaw.com

Kim F. Ebert
OGLETREE, DEAKINS, NASH, SMOAK
  & STEWART
kim.ebert@ogletreedeakins.com

Bonnie L. Martin
OGLETREE, DEAKINS, NASH, SMOAK
  & STEWART
bonnie.martin@odnss.com