UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| MONICA SCHMUTTE, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:05-cv-0311-LJM-WTL |
| | ) | |
| RESORT CONDOMINIUMS | ) | |
| INTERNATIONAL, LLC., | ) | |
| Defendant. | ) | |

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on the defendant's, Resort Condominiums International, LLC

("RCI"), Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure

and Local Rule 56.1.  Plaintiff, Monica Schmutte ("Schmutte"), alleges that RCI, her former

employer, violated her substantive rights under the Family and Medical Leave Act of 1993

("FMLA"), 29 U.S.C. § 2601 *et seq.*, and retaliated against her for taking protected FMLA leave.

The issues have been fully briefed by the parties and are ripe for ruling.  For the reasons discussed

herein, the Court **DENIES** the defendant's Motion for Summary Judgment.

## I.  FACTUAL & PROCEDURAL BACKGROUND

The following facts are either undisputed or reflect the evidence in light most favorable to

Schmutte, as the party opposing summary judgment.  Adverse facts established by RCI beyond

reasonable dispute are necessarily included in the narrative.

## A.  WORK HISTORY

Schmutte began working for RCI in February 1999.  Declaration of Monica Schmutte ("Dec. Schmutte"),  p. 1. In August 1999, Schmutte transferred to the Clubs Department and was responsible for serving customers who belonged to the Shell Vacations Club.  Dec. Schmutte, p. 1. Lisa Ogborn ("Ogborn") was Schmutte's Team Leader throughout 2003 and 2004.  Dec. Schmutte, p. 2.  Sometimes Schmutte cried while she was working, and Ogborn told her to meet with her in her cube.  Deposition of Lisa Ogborn ("Dep. Ogborn"), p. 25, 29-30.  Ogborn spoke to Jennifer Dickson ("Dickson"), the Manager of the Shell Vacations Club, on more than one occasion about interpersonal problems that Schmutte was experiencing.  Dep. Ogborn, p. 25, 30.  Ogborn let Dickson know that Schmutte was crying or upset.  Dep. Ogborn, p. 25-26.

RCI's attendance policy is a point based system in which employees earn points by working designated periods without an absence or lose points for being absent or for being late for work or for leaving early.  Dec. Schmutte, p. 2.  At the beginning of each calendar year, employees receive their allotted sick days.  Dec. Schmutte, p. 23; Ex. 22.  Attendance points are not deducted if an employee had an available sick day and called in sick.  *Id.*

On October 8, 2001, Schmutte notified RCI that she wanted to take intermittent medical leave for migraine headaches and kidney stones.  Dec. Schmutte, p. 2; Ex. 1.  Schmutte was granted intermittent FMLA leave from October 8, 2001, to April 7, 2002.  Dec. Schmutte, p. 2; Ex. 1.  In April 2002, Schmutte notified RCI's Benefits Department that she needed to continue taking intermittent medical leave for her migraine headaches and kidney stones.  Dec. Schmutte, p. 3; Ex. 2. This request for intermittent leave was processed by Eileen Burtzlaff ("Burtzlaff"), the Benefits Administrator.  *Id.*  Burtzlaff denied Schmutte's request with respect to her migraine headaches

because taking over-the-counter medication was not considered a regimen of continuing treatment. *Id*. RCI approved Schmutte's intermittent leave request for her kidney stones from April 8, 2002, through October 8, 2002. *Id*.

According to Schmutte, Dickinson reacted negatively to Schmutte's intermittent leave. Dec. Schmutte, p. 3. When Schmutte informed Dickinson that she needed intermittent leave, Dickinson sighed, or said "what is it this time?" *Id*. Dickinson also used an unfriendly voice, which was contrary to her usual friendly behavior. *Id*. From February 2002, through May 2002, Dickinson communicated to Burtzlaff about Schmutte's use of intermittent leave, and those communications reflect Dickinson's displeasure of Schmutte's use of intermittent leave. Deposition of Eileen Burtzlaff ("Dep. Burtzlaff"), p. 53-61; Ex. 7, 9-13. Schmutte was certified through October 2002; however, on May 8, 2002, her intermittent leave was terminated. *Id*.

On July 16, 2002, Schmutte notified RCI that she needed continuous medical leave beginning on July 19, 2002. Dec. Schmutte, p. 3-4; Deposition of Benedict ("Dep. Benedict"), p. 46-47; Ex. 3. At that time, Schmutte had been seeing a therapist from Indianapolis Psychological Associates, and Stephanie Sheets ("Sheets"), a nurse practitioner, had prescribed her Paxil and Wellbutrin. *Id*. On July 18, 2002, Sheets completed a certification form to certify Schmutte's request for medical leave. Dec. Schmutte, p. 4; E3. Sheets stated on the certification form that Schmutte had depression and anxiety and was taking the prescription medications Paxil and Wellbutrin SR. *Id*. Sheets initially certified Schmutte's leave through August 5, 2002, but later extended her leave to August 11. *Id*.

Around May 2003, Dr. Karen Beard ("Dr. Beard"), Schmutte's family physician, prescribed Zoloft to treat Schmutte's depression. Dec. Schmutte, p. 4. Schmutte continued treatment with Dr.

Beard for her depression through January 2004. *Id*; Deposition of Dr. Beard ("Dep. Beard"), p. 24; Ex. 1.

In July 2003, Schmutte started treatment with Kelly Benedict ("Ms. Benedict"), a licensed marriage and family therapist. Dec. Schmutte, p. 4. Ms. Benedict diagnosed Schmutte with major depression and post traumatic stress disorder ("PTSD"). *Id*; Deposition of Kelly Benedict ("Dep. Benedict"), p. 26, 47; E3. The PTSD related to sexual abuse that Schmutte suffered as a child. Dec. Schmutte, p. 4 ; Dep. Benedict; E1.

From July 2003 until her termination, Schmutte met with Ms. Benedict on a weekly basis for individual therapy. Dec. Schmutte, p. 4; Dep. Benedict p. 37-38; E4. Schmutte had one therapy session with Ms. Benedict from September 24, 2003, until November 10, 2003; Schmutte explains this was because she was being treated at the St. Vincent's Stress Center. Dec. Schmutte, p. 4; Dep. Benedict, p. 44-45. During Schmutte's employment with RCI, her therapy sessions with Ms. Benedict were covered by RCI's health insurance benefits. Dec. Schmutte, p. 4; Dep. Benedict, p. 37-40, E4.

From July through September 2003, Schmutte's symptoms of depression worsened. Dec. Schmutte, p. 5. On August 7, 2003, Dr. Beard increased Schmutte's Zoloft to 100 mg. *Id*; Dep. Benedict, p. 56-57; Dep. Beard, p. 22. Dr. Beard increased Schmutte's Zoloft to 150 mg on August 28. *Id*; Dep. Beard, p. 22. On August 28, Dr. Beard noted that Schmutte was having suicidal ideations earlier that week. Dep. Beard, p. 22; Ex. 5. Schmutte sought treatment with Dr. Beard on September 11, 2003, for depression and because she had a headache for a few days with dizziness. Dec. Schmutte, p. 5; Dep. Beard, p. 23. Dr. Beard asked Schmutte to return in one month. *Id*. Schmutte's next appointment with Dr. Beard was on October 9, 2003. *Id*.

On the evening of September 17, 2003, Schmutte attempted suicide. Dec. Schmutte, p. 5. Schmutte went to work on September 18, and told her co-worker, Luanne Moore, that she had attempted suicide. Dec. Schmutte, p. 5. Moore informed Team Leader Ogborn about Schmutte's suicide attempt. *Id*. Shortly thereafter, Gayla Jackson ("Jackson") approached Schmutte at her desk and escorted her to the Human Resources Office. Ogborn was also present. *Id*.

When they arrived at the Human Resources Office, Jackson, Ogborn, and Schmutte met with Brad Binder ("Binder"), the Manager of Human Resources. Dec. Schmutte, p. 5 ; Dep. Ogborn, p.44-46; Dep. Jackson, p. 24-26. Binder told Schmutte that he was aware that she had attempted suicide. Dec. Schmutte, p. 5. Binder suggested that Schmutte look into the counseling program offered to RCI's employees. *Id*. Schmutte told Binder that she had suffered from depression for most of her life and that she was already in therapy and taking medication for her depression. *Id*. Binder told Schmutte that everything was going to be okay and that she needed to go back upstairs to work and get on the phone. Dep. Ogborn, p. 45. After Ogborn took Schmutte upstairs, a concerned co-worker told Team Leader Ogborn that Schmutte had tried to commit suicide on a prior occasion. Dep. Ogborn, p. 46-47. Ogborn told Dickinson about Schmutte's recent suicide attempt and that she had attempted suicide on a prior occasion. Dep. Ogborn, p. 47.

The next day, September 19, 2003, Schmutte was admitted to St. Vincent's Stress Center for Adults ("Stress Center"). Dec. Schmutte, p. 5; Deposition of Dr. Sanjay Mishra ("Dep. Mishra"), p. 20-22, E1; Declaration of Kim Jeselskis ("Dec. Jeselskis"), ¶¶'s 6-7, E4-5). Schmutte notified Ogborn that she had been admitted to the hospital. Dec. Schmutte, p. 6. Schmutte received in-patient treatment at the Stress Center for one week. Dec. Schmutte, p. 5. Schmutte was discharged from in-patient treatment on September 26, 2003, and she then participated in an intensive out-

patient program for six weeks.  Dec. Schmutte, p. 6.

At the Stress Center, Schmutte was treated by Dr. Mishra, Dr. Osman and Kim Papanikandros ("Papanikandros"). *Id*.  Dr. Mishra and Dr. Osman were psychiatrists who prescribed Schmutte's medication, and Papanikandros was Schmutte's therapist. *Id*; Dep. Mishra, p. 57-58; Declaration of Kim Papanikandros ("Dec. Papanikandros).  Schmutte was again diagnosed with major depression and PTSD.  Dec. Schmutte, p. 6; Dep. Mishra, p. 24-33, E2.  Schmutte continued to take Zoloft and was also prescribed Effexor XR for depression, Klonopin or Clonazepam for anxiety and Sonata to help her sleep.  Dec. Schmutte, p. 6; Dep. Mishra, p. 66-67; E2.  Schmutte took the Effexor XR every day, but took the Klonopin and Sonata only as needed.  Dec. Schmutte, 6.  In the Stress Center, Schmutte had an adverse reaction to Klonopin.  Dec. Schmutte, p. 6.  At the end of a group therapy session, Schmutte tried to get up and fell back into her chair.  *Id*.  Schmutte was extremely lightheaded and dizzy, and one of the staff members gave her oxygen.  *Id*.

In September 2003, RCI's short-term disability and FMLA administrator was CORE.  Dec. Schmutte, p. 6.  Schmutte called CORE on September 19, 2003, to notify them that she was in the hospital and needed to take medical leave.  *Id*.  Schmutte asked CORE to fax paperwork to the hospital.  *Id*; Dep. Mishra, p. 51, E4.  Schmutte's leave from September 19, 2003, to November 11, 2003, was covered by the FMLA.  Dec. Schmutte, p. 7.  Schmutte's doctors provided information to CORE about her medical condition throughout her leave.  *Id*; Dec. Papanikandros, ¶¶'s 3-4, E1; Dec. Jeselskis, ¶¶'s 4-5, E2-3).

The documentation sent to CORE provides that Schmutte's diagnosis was major depression.  Dec. Papanikandros, ¶¶4, E1.  The documentation stated that Schmutte suffered from a depressed mood, acute anxiety, concentration problems, reported sleep disturbance, anhodonia, isolation,

decreased function including inability to work at present, that Schmutte was taking Zoloft, Klonopin, Effexor XR and Sonata, and that Schmutte had a history of mental illness and treatment. *Id*.

Dr. Mishra and Dr. Osman gave Schmutte refills on her prescriptions for Klonopin and Effexor XR. Dec. Schmutte, p. 7. Dr. Beard continued to prescribe Schmutte Zoloft. *Id*. Schmutte filled her prescription for Klonopin on September 27, 2003. Dec. Schmutte, p. 7; E 5. Schmutte filled her prescription for Effexor EX on September 27, October 26, November 25, and December 23, 2003. *Id*. Schmutte filled her prescription for Zoloft on September 13, October 18, November 11, December 9, 2003, and January 8, 2004. *Id*. After the Stress Center released Schmutte, she continued to see Ms. Benedict for therapy and continued to take the medications prescribed by Drs. Beard, Mishra, and Osman. Dec. Schmutte, p. 7. Also during this time, Ms. Benedict was working with Schmutte to find a psychiatrist closer to Schmutte's home. Dec. Schmutte, p. 8; Dep. Benedict, p. 55, 65-66, E3.

Schmutte returned to work on November 12, 2003. Dec. Schmutte, p. 7, E 4; Dep. Butzlaff, p. 88, E33. When Schmutte returned, she had ten attendance points. Dec. Schmutte, p. 8. According to Schmutte, she did not apply for intermittent FMLA leave when she returned to work because she did not believe that RCI would approve such a request based on Dickinson and Burtzlaff's reaction to her prior intermittent leave request. *Id*. After Schmutte returned to work, Team Leader Ogborn asked her how she was doing. Dec. Schmutte, p. 8. Schmutte told Ogborn that she was doing better than before she left, but that it was a long road ahead. *Id*. Schmutte also told Ogborn that she was not cured and that she needed additional treatment. *Id*. Ogborn noticed that when Schmutte returned to work she seemed a little sad or seemed down. Dep. Ogborn, p. 76. Ogborn also noticed that Schmutte was visibly upset at times. *Id*.

7

Schmutte met with Ms. Benedict for therapy sessions on November 11, November 17, and November 25, 2003. Dep. Benedict, p. 33, E3. Ms. Benedict observed during Schmutte's November 17, session that Schmutte's symptoms were returning very rapidly. Dep. Benedict, p. 60, E3.

On November 23, 2003, Schmutte arrived to work on time, but left early because she had a panic attack. Dec. Schmutte, p. 8; E 6. Schmutte did not take her Klonopin to work because she was afraid that she would have the same reaction she had in the Stress Center, and she did not want to pass out. *Id*. Schmutte notified the Team Leader on duty that she was leaving because she was not feeling well. *Id*. Schmutte was not advised to apply for FMLA leave to cover her November 23 absence. *Id*. Schmutte lost two attendance points because she left early. *Id*.

On December 1, 2003, Schmutte left work early because she had a panic attack. Dec. Schmutte, p. 9; E 8. Schmutte had to go home to take Klonopin because she did not want to take the medication while at work. *Id*. Schmutte notified Team Leader Ogborn that she had to leave work because she was having difficulty dealing with the job stress and having anxiety. *Id*. Schmutte was not advised to apply for FMLA to cover her December 1 absence. *Id*. Schmutte lost two attendance points because she left early. *Id*.

Schmutte met with Ms. Benedict on December 2, 2003, for a therapy session. Dep. Benedict, p. 49-50, E3. Ms. Benedict observed that Schmutte was still having bouts with depression and having trouble functioning at work. Dep. Benedict, p. 49, E3.

On December 2, 2003, Schmutte met with Everett Lanham ("Lanham"), the Group Performance Specialist ("GPS"), filling in for Kathleen Kestner, the GPS who usually handled attendance issues for the vacation guides. Dec. Schmutte, p. 9; Dep. Lanham, p. 55-57, E8. Lanham asked Schmutte to fill out a questionnaire. Dec. Schmutte, p. 9; E9. The questionnaire indicated that

Schmutte had eight attendance points.  *Id.*  Lanham did not ask Schmutte to explain anything that she wrote on the questionnaire.  *Id.*  The meeting lasted approximately fifteen minutes.  *Id.*  On December 9, 2003, Schmutte received a "Performance Improvement Warning" for leaving early on December 1, 2003, and the warning provided that Schmutte had six attendance points.  Dec. Schmutte, p. 10; E10.

Schmutte met with Ms. Benedict for a therapy session on December 9, 2003.  Dep. Benedict, p. 50, E3.  Ms. Benedict noted that Schmutte's feelings of hopelessness and loneliness were returning.  *Id.*  Schmutte also reported feeling a low initiative at work.  *Id.*

On December 11, 2003, Schmutte left work early because she had a panic attack.  Dec. Schmutte, p. 10, E11.  Schmutte went home and took Klonopin.  *Id.*  Schmutte was still concerned about taking the Klonopin while at work because of the reaction she had in the Stress Center.  *Id.* Schmutte notified Team Leader Ogborn that she was leaving early because of the job stress and anxiety.  *Id.*  Schmutte was not advised to seek FMLA leave to cover her absence.  *Id.*  Schmutte lost four attendance points for leaving early that day because she did not work at least half of her shift. *Id.*  Schmutte received a "Performance Improvement Warning" from Ogborn on December 15, 2003, because of her December 11, 2003, absence.  Dec. Schmutte, p. 10; E12. The warning provided that Schmutte had two attendance points remaining.  *Id.*

Schmutte met with Ms. Benedict on December 18, 2003, for therapy, and Ms. Benedict reported that the session was one of the worst sessions she had with Schmutte.  Dep. Benedict, p. 50-51, E3.  Schmutte was again describing some suicidal ideation.  *Id.*  The December 18, 2003, session was the last session that Ms. Benedict had with Schmutte in December because Ms. Benedict was on vacation from December 19, until January 6, 2004.  Dep. Benedict, p. 51.

## B.  SCHMUTTE'S DECEMBER 22, 2003, ABSENCE

On December 22, 2003, Schmutte was scheduled to work from 10:00 a.m. to 6:30 p.m. Dec. Schmutte, p. 11; E13.  Schmutte arrived to work on time, but shortly after Schmutte arrived she began to have a panic attack.  *Id*.  Schmutte had brought her Klonopin to work that day because she had left work early on three prior occasions.  *Id*.  Schmutte took a Klonopin hoping to alleviate the panic attack so that she could continue working.  *Id*.  One hour after Schmutte took the Klonopin, she began to feel very dizzy and light-headed.  Dec. Schmutte, p. 11.  Schmutte called to her co-worker, Shari Johnson ("Johnson").  *Id*.  Schmutte told Johnson that she was not feeling well and asked her to get a supervisor.  *Id*.  Schmutte then fell out of her chair onto the floor.  *Id*.  When Schmutte regained consciousness, several people were surrounding her as she lay on the floor.  Dec. Schmutte, p. 11.  Schmutte's co-worker Luanne Moore ("Moore") was at her head.  *Id*.  The Director of Client Sales and Services, Lea Watts ("Watts"), and Team Leader Ogborn, were also present.  *Id*.  Individuals from RCI's corporate security department were also present.  *Id*.  The paramedics were present when Schmutte first regained consciousness or arrived shortly thereafter.  *Id*.

Schmutte heard someone say that she needed to go to the hospital.  Dec. Schmutte, p. 11.  Schmutte, who knew that she only had two attendance points remaining, protested and stated that she could not go to the hospital because she would lose her job.  *Id*.  Watts told Schmutte not to worry about her job, that her job was safe, and that Schmutte needed to worry about going to the hospital and getting better.  *Id*.  The paramedics then took Schmutte to the hospital.  *Id*.  Schmutte arrived at the Methodist Hospital emergency room around 1:30 p.m.  Dec. Schmutte, p. 11; Dec. Jeselskis, ¶¶'s 8-9, E6-7.  She was put on oxygen and received a shot of Xanax.  *Id*.  Schmutte remained at the hospital until around 6:00 p.m.  *Id*.

### C.  SCHMUTTE'S FMLA REQUEST

Schmutte returned to work on December 23, 2003.  Dec. Schmutte, p. 12.  She asked Team Leader Ogborn how she could protect her job in light of her early departure the day before.  *Id*.  Ogborn told Schmutte to see Lanham or Burtzlaff.  *Id*.  Schmutte then went to see Lanham and told him what had happened the day before, that she was taken to the hospital, and that Watts told her that her job was safe.  Dec. Schmutte, p. 12.  Schmutte asked Lanham how she should fill out her time card so that her job was protected.  *Id*.  Lanham said he would "look into it" and get back with her.  *Id*.  Schmutte did not hear back from Lanham before the Christmas holiday.  Dec. Schmutte, p. 12; E14.  Schmutte returned to work on Thursday, December 30, 2003, and asked Lanham if he had any information about her situation.  *Id*.  He told Schmutte that she should look into FMLA.  *Id*.

Schmutte then e-mailed Burtzlaff and explained that she had an adverse reaction to her medication on December 22, and was taken to the hospital.  Dec. Schmutte, p. 12.  Schmutte also told Burtzlaff that she wanted to apply for FMLA.  *Id*.  Burtzlaff responded that Schmutte should contact The Answer Place ("TAP").  *Id*.  TAP was an internal call center for employees.  Dec. Schmutte, p. 12.  On December 30, 2003, Schmutte called TAP and told the person who answered the phone that she wanted to request FMLA leave.  Dec. Schmutte, pg. 12.  Schmutte explained that she had a panic attack at work, took her anxiety medication, and passed out.  *Id*.  She also told the person that RCI had contacted an ambulance, which had taken her to the hospital.  *Id*.  The person on the phone told Schmutte that TAP would contact CORE and send Schmutte the FMLA paperwork and that it should be sent back within fifteen days.  *Id*.

Schmutte was off work January 1, and January 2, 2004.  Dec. Schmutte, p. 13; E14.  On January 5 or 6, Schmutte called CORE to make sure that they received her FMLA request from TAP

because she had not received the FMLA paperwork.  Dec. Schmutte, p. 13.  The representative on

the phone said that the paperwork would be mailed.  *Id*.  The representative also faxed Schmutte the

medical certification form.  *Id*.  CORE sent the paperwork out that day; however, Schmutte did not

receive it until on or shortly after January 13, 2004.  Dec. Schmutte, p. 15; E16.

In January 2004, Schmutte was allotted four sick days.  Dec. Schmutte, p. 23; E22.  Schmutte

should not have lost any attendance points for calling in sick on those days because she had available

sick time.  *Id*.  Schmutte called in sick on January 6, 7, and 14, 2004 as a result of her depression and

anxiety.  *Id.*  On January 7, 2004, Dickinson e-mailed Burtzlaff and copied Jackson.  Dep. Jackson,

p. 29-30, E2.  Dickinson asked Burtzlaff whether she knew "if [Schmutte's] FMLA was approved

[because] [i]f not, this call-in takes her into negative points, so I'm just curious . . . ."  *Id*.

On January 7, 2004, Schmutte dropped off the FMLA certification form at Dr. Beard's office

and asked Dr. Beard to complete it.  Dec. Schmutte, p. 13.  Schmutte's therapist had been on

vacation, so she did not think to send the certification form to her.  *Id*.  Schmutte had a therapy

session with Ms. Benedict on January 7, but had already given the certification form to Dr. Beard

to fill out.  *Id*.  Schmutte told Ms. Benedict that she had an adverse reaction to Klonopin, was taken

to the hospital, and was seeking FMLA leave.  *Id*.

Later that day, Dr. Beard's nurse called Schmutte and said they were having difficulty filling

out the certification form.  Dec. Schmutte, p. 13.  The nurse said that by looking at the form they did

not know which box to check.  *Id*.  In response, Schmutte called CORE and told the person on the

phone that her physician was having difficulty filling out the certification form.  Dec. Schmutte, p.

13.  Schmutte explained what had happened on December 22.  *Id*.  The person told Schmutte that

CORE could not legally tell her what box to check, but based on what she described it sounded like

the absence plus treatment box should be checked. *Id*. Schmutte called her doctor's office and told the nurse what the CORE representative had said. *Id*.

On January 8, Schmutte drove to Dr. Beard's office and picked up the certification form. Dec. Schmutte, p. 14; E15. The form had Dr. Beard's signature, so Schmutte had no reason to believe that Dr. Beard did not fill out the form. *Id*; Dep. Beard, p. 34, E4. Schmutte faxed the certification form and a cover letter to CORE. Dec. Schmutte, p. 14; E15. On the certification form, the box checked was the "Absence Plus Treatment (Acute)" box. Dec. Schmutte, p. 14; E15; Dep. Beard, E4. The form stated that Schmutte was last seen on October 9, 2003. *Id*. In response to: "Provide a description of the continuing regimen of treatment such as therapy, prescription medications, etc.[,]" Dr. Beard's office wrote, "Prescription meds for anxiety treatment to continue." *Id*. In response to: "Provide the medical facts that support your identification of this illness as a serious health condition as defined," Dr. Beard wrote, "Patient seen in Methodist ER 12/22/03 for acute episode with fainting spell and dizziness." *Id*. Dr. Beard also indicated that the condition kept Schmutte from performing the essential functions of her job that day. *Id*.

On January 9, Schmutte called CORE to confirm that they had received the certification form and cover letter that she faxed on January 8, 2004. Dec. Schmutte, p. 14. CORE confirmed receipt of Schmutte's fax. *Id*. To keep RCI updated, Schmutte also told Lanham that she had received the FMLA paperwork and faxed it to CORE. Dec. Schmutte, p. 15.

Jeanette D'Addario ("D'Addario") was the CORE employee responsible for denying or approving Schmutte's FMLA request. Deposition of Jeanette D'Addario ("Dep. D'Addario"), p. 38. D'Addario held the position of Family Leave Coordinator, and in her position she "adjudicates" absences. Dep. D'Addario, p. 12. D'Addario believed that she was only permitted to call a doctor

13

if she could not read the writing on the certification form and needed clarification.  Dep. D'Addario, p. 16.  In making her determination on Schmutte's FMLA request, D'Addario looked at the certification form.  Dep. D'Addario, p. 52, E1.  D'Addario denied Schmutte's FMLA request because Schmutte was "out of work for one day, no follow-up visit, no treatment plan, does not meet criteria for serious health condition."  Dep. D'Addario, p. 51, E1.  At her deposition, D'Addario attempted to state why she denied Schmutte's request:

> The information that this is an absence plus treatment, the person was not out for that amount of time
>
> [E]verything was looked at to see if it was qualifying under any of the situations, a (sic) overnight stay in a hospital        a chronic condition requiring treatment which would be episodic        However, if you notice, follow-up treatments, nothing, not scheduled.  Treatment schedule times, approximate length of treatment, no, there was no visit back to the doctor. . . . [This absence did not qualify as a chronic condition b]ecause the doctor did not put down dates for follow-up treatment, did not put down the treatments, how many times or any information like that, and a chronic treatment does require that the doctor give us follow-up visits and give us a time span.

Dep. D'Addario, p. 54-55, 57-59.

On January 12 or 13, Schmutte contacted CORE to inquire about the status of her leave request.  Dec. Schmutte, p. 15.  The person Schmutte spoke with told her that the FMLA request was denied because Schmutte did not have a serious health condition.  *Id*.  The person did not tell her that the certification form was insufficient, inadequate or incomplete or ask her to have her doctor provide more information.  *Id*.  The person also never told Schmutte that she could appeal the denial of her leave request or that there was an appeal deadline.  *Id*.  Schmutte never received anything in writing from CORE informing her that her FMLA request had been denied or advising her of any appeal rights, despite CORE's claims that a letter was mailed.  *Id*.

When Schmutte learned her FMLA request was denied, she told Lanham about the denial and

14

asked him what she needed to do in light of the fact that Watts said that her job was safe the day she was taken to the hospital.  Dec. Schmutte, p. 15.  Lanham responded that he would "look into it." *Id*.  Schmutte never heard back from him or any other supervisor.  Dec. Schmutte, p. 15.  Around this time, Schmutte spoke with Team Leader Ogborn and asked if Ogborn knew what was going on. Dec. Schmutte, p. 16.  Ogborn told Schmutte to speak with Burtzlaff or Lanham. *Id*.  Schmutte told Ogborn that she had spoken with Burtzlaff and Lanham and that they did not have any answers.  *Id*. Ogborn was not responsive.  *Id*.  Ogborn testified that she "stayed out of it" because she did not want to get involved.  Dep. Ogborn, p. 85.

On January 12, CORE notified Burtzlaff through e-mail that Schmutte's FMLA request was denied.  Dep. Burtzlaff, p. 94-96, E35.  The e-mail sent to Burtzlaff stated, "You or your manager may request an administrative review of this decision by submitting the request in writing to CORE, along with any substantiating information.  Our office must receive the request via fax or mail on or before 01/18/2004."  *Id*.  Burtzlaff testified that a manager cannot request an administrative review.  Dep. Burtzlaff, p. 95.  Burtzlaff did not notify Schmutte or her supervisors when she received notice of the denial.  Dep. Burtzlaff, p. 95-96.

On January 13, Lanham e-mailed Jackson and advised her that Schmutte's "FMLA will not be approved for 12/22, when she had an ambulance take her from the facility.  This will result in termination.  But there is a new twist, she stated that Lea Watts told her that day she would not lose her job."  Dep. Jackson, p. 19, E4; Dep. Lanham, p. 66, E10.  Lanham also copied Binder, Dickinson, and Kathleen Kestner on the e-mail.  *Id*.  Jackson then e-mailed Burtzlaff to see whether she had "heard anything about [Schmutte] yet."  Dep. Jackson, p. 19, Dep. E4.  On January 13 and 14, Binder, Jackson, Dickinson, Ogborn, Kestner, and Lanham e-mailed each other about Schmutte.

15

Dep. Jackson, p. 34, E5.

Schmutte e-mailed Lanham on January 19 or 20, 2004, again asking him if he knew anything about how RCI was going to treat the day Schmutte went to the hospital or who she should talk to find out the status.  Dec. Schmutte, p. 16; Dep. Lanham, p. 74-76, E11.  Schmutte also told Lanham in the e-mail that she may need more FMLA leave.  *Id*.

### D. SCHMUTTE'S TERMINATION

Schmutte was terminated on January 20, 2004.  Dec. Schmutte, p. 16.  At that time, the only correspondence Schmutte had received from CORE was the January 5, 2004, correspondence that she received on January 12 or 13, 2004.  *Id*; E16.  On the day that Schmutte was terminated, Team Leader Ogborn escorted Schmutte to Binder's office.  Dec. Schmutte, p. 16-17.  Binder went over the attendance policy and showed Schmutte an attendance warning that she received.  *Id*.  He told Schmutte that because she had zero attendance points, she was terminated.  *Id*.  This was the first time that RCI had mentioned to Schmutte that termination could result from her December 22, absence.  *Id*.

Schmutte told Binder about the day that she passed out and that Lea Watts told her that her job was safe.  *Id*.  Binder asked Schmutte if she had any witnesses to what Watts said, and Schmutte gave him the name of her co-worker Moore.  *Id*.  Binder told Schmutte that he would speak with Watts to find out what she said.  *Id*.  Schmutte told Binder that she spoke with Lanham after she was denied FMLA and asked Lantham what she needed to do to protect her job and that Lanham never got back with her.  *Id*.  Binder then told Schmutte that she could appeal her FMLA denial.  *Id*. Schmutte told Binder that she was not aware that she could appeal her FMLA denial and that she

never got anything from CORE informing her that she could appeal the denial. *Id*. Schmutte left Binder's office and found that her personal belongings were packed up. *Id*.

In between the time Schmutte learned her FMLA request was denied and her termination, she followed-up with Lanham several times. Dec. Schmutte, p. 16; Dep. Lanham, p. 76-77. Each time Schmutte asked Lanham about the status of her December 22, absence and what she needed to do, he responded, "I'll look into it." Dec. Schmutte, p. 16. Schmutte also followed-up with Team Leader Ogborn, on several occasions. *Id*. Ogborn's only response was that Schmutte should talk to Lanham or Burtzlaff. *Id*. Schmutte did not contact CORE in between the time that she was told that her FMLA request was denied and her termination because she believed that Lanham was speaking with the supervisors and "looking into it." Dec. Schmutte, p. 16.

### E.  SCHMUTTE'S FMLA APPEAL AND SECOND CERTIFICATION FORM

On January 20, after Schmutte was terminated, she contacted CORE and asked about appealing the denial of her FMLA request. Dec. Schmutte, p. 17. The person Schmutte spoke with told her that she was past the time to appeal the denial. *Id*. The person did not tell Schmutte that the appeal deadline was January 18, 2004. *Id*. Schmutte said that she was still sending in her appeal. *Id*. The person on the phone provided Schmutte with a fax number and Schmutte typed up a cover letter and faxed her appeal to CORE. *Id*.

Schmutte called CORE on January 21, 2004, to confirm that CORE received her fax, and she spoke with a person named "Jamie." Dec. Schmutte, p. 17, E 17. Jamie told Schmutte that CORE did not receive the fax. *Id*. Jamie gave Schmutte another fax number, and she re-faxed her appeal around 5:45 p.m. *Id*.

Also, on January 21, 2004, Schmutte had a therapy session with Ms. Benedict. Dec. Schmutte, p. 18; Dep. Benedict, p. 66-67, E3. Schmutte told Ms. Benedict that her FMLA request was denied and that her employment was terminated. Dec. Schmutte, p. 18. Schmutte asked Ms. Benedict if she would complete another certification form for her. *Id*. Ms. Benedict filled out the certification form. *Id*; Dep. Benedict, p. 68, E6.

On January 22, 2004, Schmutte called CORE to confirm that her January 21, 2004, fax had been received. Dec. Schmutte, p. 18. The person on the phone confirmed that CORE received her fax. *Id*. Schmutte later faxed CORE the new certification form filled out by Ms. Benedict and a copy of Fact Sheet #28 from the Department of Labor website. Dec. Schmutte, p. 18-19; E18. The certification form completed by Ms. Benedict provided that Schmutte's condition qualified as a serious health condition under the category regarding chronic serious health conditions. Dec. Schmutte, p. 19, E18; Dep. Benedict, p. 70-74, E6. The medical facts that Ms. Benedict wrote to support Schmutte's serious health condition were:

> Major depression with panic attacks and anxiety—recurrent episode[.] Post traumatic stress disorder—ongoing[.] The degree of severity is fluctuating and therefore may cause episodic incapacity both due to the condition and the medication management. Chronic condition[.]

Dep. Benedict, p. 70-74, E6. Ms. Benedict wrote that the approximate date Schmutte's condition commenced was "May 2003," that the probable duration was "6 months [to] 1 year," and that it was necessary for Schmutte to take intermittent absences as a result of her condition because of the "severity of [her] depression and the fluctuation of her anxiety. *Id*. Ms. Benedict also wrote that Schmutte's anxiety attacks "occur approximately once a week" and that she "became incapacitated" at work on December 22, 2003, because of a "bad reaction" to her anxiety medication. *Id*.

On January 26, 2004, Schmutte called CORE to check on the status of her appeal. Dec.

18

Schmutte, p. 19.  Schmutte was informed that her appeal was denied, and Schmutte asked to speak with a supervisor.  *Id*.  Schmutte spoke with Cheryl who told Schmutte that her appeal was denied because the appeal deadline had expired and because her absence was not considered a serious health condition.  *Id*.  Cheryl also said that if Schmutte's family doctor had mentioned anything about her having an anxiety attack CORE would have approved the FMLA request no matter what.  *Id*.  Schmutte told Cheryl that the first certification form she submitted provided that she was taking medication for anxiety, so she assumed they understood that she had anxiety.  *Id*.  Cheryl said that description was not sufficient and that her therapist was not a qualified health care provider.  *Id*.

D'Addario made the ultimate decision on the appeal.  Dep. Sanders, p. 49-50.  Schmutte received the January 26, 2004, denial letter on January 29.  Dec. Schmutte, p. 20; E19.  The January 26, denial letter stated, "The request has been denied because the medical facts supplied by the employee's provider do not support the absence under the family and medical leave guidelines. Also, the appeal letter was due 1/18/2004 and it was not faxed until 1/21/2004."  *Id*.  The denial letter further provided that "As of the date of this letter, CORE has received no additional information to reconsider this denial          "  *Id*.

On January 29, Schmutte called CORE regarding the denial.  Dec. Schmutte, p. 20.  Schmutte asked if her doctor could call and speak with someone.  *Id*.  The person on the phone said that Schmutte's doctor was welcome to call.  *Id*.  Schmutte called Dr. Beard's office and asked them to contact CORE regarding her condition.  *Id*.  D'Addario took the phone call from Leanne Craig ("Ms. Craig"), a nurse with Schmutte's doctor's office.  Dep. D'Addario, pgs. 65-66, E1.  Ms. Craig asked D'Addario if she could provide any information to overturn the denial.  *Id*.  D'Addario's response was "No, it is past the time for an appeal.  Sorry."  *Id*.

## F.  SCHMUTTE'S THIRD CERTIFICATION FORM

On January 30, 2004, Schmutte's step-father called CORE on her behalf.  Dec. Schmutte, p. 20.  The CORE representative told him that Schmutte could send a letter to appeal the decision to deny her FMLA request.  *Id*.  Later that day, Schmutte faxed CORE the medical certification completed by Ms. Benedict and a cover letter.  *Id*; E20.  Schmutte had already submitted the certification, but because CORE told Schmutte that her therapist was not a qualified health care provider, Ms. Benedict had her supervisor, Diane Burkes ("Ms. Burkes"), sign the form when it was submitted for the second time.  *Id*; Dep. Benedict, p. 74-76, E7.  Ms. Burkes is a licensed clinical social worker and is very familiar with Schmutte's case.  Dep. Benedict, p. 75.  Schmutte called CORE to confirm that they had received the fax.  Dec. Schmutte, p. 20.  "Julia" confirmed that CORE had received the fax.  *Id*.

Schmutte called CORE on February 3, to check on the status of her appeal.  Dec. Schmutte, p. 21.  Schmutte was advised that CORE had received her appeal and that it was forwarded for review.  *Id*.  Schmutte called CORE on February 4, to check on the status of her appeal. *Id*.  "Matt" told Schmutte that her appeal was being reviewed.  *Id*.  Schmutte called CORE on February 6, to check on the status of her appeal.  Dec. Schmutte, p. 22.  Schmutte was told that there was nothing new to report.  *Id*.  Schmutte asked the person to send any correspondence to her by certified mail because she had problems receiving mail from CORE.  *Id*.  Schmutte called CORE on February 10, to check on the status of her appeal.  *Id*.  "Nicole" told Schmutte that there was no update.  *Id*.  Schmutte asked Nicole how long the appeal process took, and she said that it could take two weeks or forty-five days.  *Id.*  Schmutte called CORE on February 13, to check on the status of her appeal.  *Id.*  "Sharon" told Schmutte that her appeal was denied and that her request for leave could not be

approved.  *Id*.  Schmutte did not receive anything in writing from CORE regarding this conversation with Sharon or denial.  *Id*.

On February 27, Schmutte faxed a letter and all of her FMLA certification forms, cover letters, facsimile forms, and a new cover letter to Binder and asked him to review her case.  Dec. Schmutte, p. 22; E21.  Binder reviewed the fax, but he could not remember what he did with it.  Dep. Binder, p. 64-67; E6.

### G.  SCHMUTTE'S COMPLAINT FILED WITH THE DEPARTMENT OF LABOR

In late February or early March 2004, Schmutte contacted the Department of Labor ("DOL") to file a complaint regarding her termination.  Dec. Schmutte, p. 22.  The investigator looking into Schmutte's complaint was Steve Garrett ("Garrett").  *Id*; Dep. Sanders p. 51.  The "FMLA Narrative" in the DOL file states:

> Complainant alleged that she was wrongfully terminated.  This employee alleged that the employer was fully aware of her serious health condition . . . .  The alleged violation of "termination" was substantiated.  The complainants' absence from work on 12/22/03 was directly related to her serious health condition of depression and anxiety where leave had been previously granted by RCI and approved by Mrs. Eileen Burtzlaff, Benefits administrator . . . .

Dec. Jeselskis, ¶3, E1).

Carla Sanders ("Sanders"), an employee with CORE, was responsible for communicating with the DOL investigator.  Deposition of Carla Sanders ("Dep. Sanders"), p. 50-51.  Garrett told Sanders that it was his position that Schmutte had suffered a violation and that she was entitled to back pay and reinstatement.  Dep. Sanders, p. 52.  The investigator told Sanders that he based his decision on the fact that Schmutte had a prior health condition that required her to be in therapy and that the supervisor should have been privy to the preexisting situation.  Dep. Sanders, p. 54.  Garrett

tried to resolve Schmutte's complaint with RCI, but he told Schmutte that RCI was not interested in reinstatement and offered to resolve her complaint for only $100.00.  Dec. Schmutte, p. 22.

## II. <u>STANDARDS</u>

### A. SUMMARY JUDGMENT

Summary judgment is granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the opposing party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A disputed fact is material only if it might affect the outcome of the suit in light of the substantive law. *Id.*

The moving party has the initial burden to show the absence of genuine issues of material fact.  *See Schroeder v. Barth*, 969 F.2d 421, 423 (7th Cir. 1992).  This burden does not entail producing evidence to negate claims on which the opposing party has the burden of proof.  *See Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 & n.3 (7th Cir. 1994).  The party opposing a summary judgment motion bears an affirmative burden of presenting evidence that a disputed issue of material fact exists.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Scherer v. Rockwell Int'l Corp.*, 975 F.2d 356, 360 (7th Cir. 1992).  The opposing party must "go beyond the pleadings" and set forth specific facts to show that a genuine issue exists. *See Hong v. Children's Mem. Hosp.*, 993 F.2d 1257, 1261 (7th Cir. 1993), *cert. denied*, 511 U.S. 1005 (1994). This burden cannot be met with conclusory statements or speculation, *see Weihaupt v. Am. Med. Ass'n*, 874 F.2d 419, 428 (7th Cir. 1989), but only with appropriate citations to relevant admissible

22

evidence.  *See* Local Rule 56.1; *Brasic v. Heinemann's Inc., Bakeries,* 121 F.3d 281, 286 (7th Cir. 1997); *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 923-24 (7th Cir. 1994).  Evidence sufficient to support every essential element of the claims on which the opposing party bears the burden of proof must be cited.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In considering a summary judgment motion, a court must draw all reasonable inferences "in the light most favorable" to the opposing party.  *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 392 (7th Cir. 1992).  If a reasonable fact finder could find for the opposing party, then summary judgment is inappropriate.  *Shields Enters., Inc. v. First Chi. Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992).  When the standard embraced in Rule 56(c) is met, summary judgment is mandatory.  *Celotex Corp.*, 477 U.S. at 322-23; *Shields Enters.*, 975 F.2d at 1294.

The summary judgment standard is applied with added rigor in employment discrimination cases because of the crucial role played by motive, intent, and credibility in resolving such cases.  *Pitasi v. Gartner Group, Inc.*, 184 F.3d 709, 714 (7th Cir. 1999).   However, even when discriminatory intent is at issue, the evidence must not only address the issue of intent, but also relate to the specific employment decision in question.  *Cowan v. Glenbrook Security Serv., Inc.*, 123 F.3d 438, 443 (7th Cir. 1997).  Further, the nonmovant will not defeat summary judgment merely by pointing to self-serving allegations without evidentiary support.  *Cliff v. Board of Sch. Comm'rs*, 42 F.3d 403, 408 (7th Cir. 1994).

## B.  FMLA CLAIMS

The FMLA establishes two categories of broad protections for employees.  First, the FMLA contains prescriptive protections that are expressed as substantive statutory rights. *See King v.*

*Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir. 1999). The Act provides eligible employees of a covered employer the right to take unpaid leave for a period of up to twelve work weeks in any twelve-month period for a serious health condition as defined by the Act. *See id.* (citing 29 U.S.C. § 2612(a)(1)). After the period of qualified leave expires, the employee is entitled to be reinstated to the former position or an equivalent one with the same benefits and terms of employment that existed prior to the exercise of the leave. *See id.* (citing 29 U.S.C. § 2614(a)). To insure the availability of these guarantees, the FMLA declares it "'unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided.'" *Id.* (quoting 29 U.S.C. § 2615(a)(1)).

When an employee alleges a deprivation of these substantive guarantees, the employee must demonstrate by a preponderance of the evidence only entitlement to the disputed leave. In such cases, the intent of the employer is immaterial. *See id.* (citing *Diaz v. Fort Wayne Foundry Corp.*, 131 F.3d 711, 713 (7th Cir. 1997) ("We shall continue to resolve suits under the FMLA . . . by asking whether the plaintiff has established, by a preponderance of the evidence, that he is entitled to the benefit he claims")).

In addition to the substantive guarantees contemplated by the Act, the FMLA also affords employees protection in the event they are discriminated against for exercising their rights under the Act. *See id.* (citing 29 U.S.C. § 2615(a)(1)-(2)). Specifically, "'[a]n employer is prohibited from discriminating against employees . . . who have used FMLA leave.'" *Id.* (quoting 29 C.F.R. § 825.220(c)). Furthermore, an employer may not consider the taking of FMLA leave as a negative factor in employment actions. *See id.* Because the FMLA's implementing regulations bar certain discriminatory conduct, the protections contemplated by these sections have been characterized as

proscriptive in nature. *See id.*

In contrast to what an employee must show to establish a deprivation of a substantive guarantee under the Act, when an employee raises the issue of whether the employer discriminated against that employee by taking adverse action against him for having exercised an FMLA right, the question of intent is relevant. *See id.* The issue becomes whether the employer's actions were motivated by an impermissible retaliatory or discriminatory animus. *See id.*

FMLA retaliation claims are evaluated in the same way as claims of retaliation under Title VII. *See Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004). The plaintiff can proceed by the direct method, with direct or circumstantial evidence that the employer acted for prohibited reasons, or by the indirect method. Under the indirect method, if the plaintiff establishes a prima facie case, and the employer articulates a noninvidious reasons for its action, the plaintiff must provide evidence from which a jury reasonably could find this reason was a pretext. If so, summary judgment is inappropriate. *See Id.* at 503.

Schmutte has brought both types of claims.

### III.  DISCUSSION

### A.  SCHMUTTE'S SUBSTANTIVE FMLA CLAIM

To succeed on her substantive FMLA claim, Schmutte must prove: (1) that she is an eligible employee under the FMLA, 29 U.S.C. § 2611(2); (2) that RCI is an employer under the FMLA, 29 U.S.C. § 2611(4); (3) that she is entitled to leave under the FMLA, 29 U.S.C. § 2612(a)(1); and (4) that RCI improperly denied her leave under the FMLA, 29 U.S.C. § 2615. *See, e.g., Mason v. St. Vincent Hosp. & Health Care Ctr.*, 2004 U.S. Dist. LEXIS 27414, 12-13 (S.D. Ind. 2004). It is

undisputed that Schmutte is an eligible employee under the FMLA and that RCI is an employer under the FMLA; therefore, the first two elements are met.  However, the parties dispute whether Schmutte was entitled to FMLA leave, whether RCI had adequate notice, and whether RCI improperly denied Schmutte's alleged request for leave under the FMLA.

### 1. Entitlement to FMLA Leave

Schmutte alleges that her depression and anxiety constitute a "chronic serious health condition," which is a subset of a "serious health condition" as defined by the FMLA.  29 C.F.R. § 825.114.

> The FMLA authorizes leave, among other reasons: "Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).  "Serious health condition" is a term of art defined by the statute and the Department of Labor regulations.  This provision of the FMLA is aimed at genuinely serious and incapacitating conditions.  It was not intended to mandate, as a matter of federal law, a uniform national sick leave policy for minor or temporary illnesses and discomforts.  S. Rep. No. 103-3, at 28 (1993), reprinted in 1993 U.S. Code Cong. & Ad. News 3, 30.  Further, it is not sufficient for an employee to merely assert that he suffered from a serious health condition; a claimant must provide evidence of his serious health condition.  *See Haefling v. United Parcel Serv[.], Inc*., 169 F.3d 494, 500 (7th Cir. 1999).

*Mason v. St. Vincent Hosp. & Health Care Ctr.*, No. 1:03-cv-930-LJM-VSS, 2004 U.S. Dist. LEXIS 27414, 13-14 (S.D. Ind. 2004).  Depression may meet the description of a serious health condition under the FMLA.  *Collins v. NTN-Bower Corp.*, 272 F.3d 1006, 1008 (7th Cir. 2001).

The FMLA defines "serious health condition" as follows:

The term "serious health condition" means an illness, injury, impairment, or physical or mental condition that involves:

(A) inpatient care in a hospital, hospice, or residential medical care facility; or
(B) continuing treatment by a health care provider.

29 U.S.C. § 2611(11).  The applicable DOL regulation defines "continuing treatment by a health care provider," in pertinent part, as:

> (i) A period of incapacity (i.e., inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:
>
> (A) Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under the orders of, or on referral by, a health care provider; or
> (B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.
>
> * * * *
>
> (iii) Any period of incapacity or treatment for such incapacity due to a chronic serious health condition.

29 C.F.R. § 825.114(a)(2).  A regimen of continuing treatment includes, but is not limited to:

> a course of prescription medication (e.g., an antibiotic) or therapy requiring special equipment to resolve or alleviate the health condition (e.g., oxygen).  A regimen of continuing treatment that includes the taking of over-the-counter medications such as aspirin, antihistamines, or salves; or bed-rest, drinking fluids, exercise, and other similar activities that can be initiated without a visit to a health care provider, is not, by itself, sufficient to constitute a regimen of continuing treatment for purposes of FMLA leave.

29 C.F.R. § 825.114(b).

> The applicable DOL regulation defines a "chronic serious health condition" as one which:
>
> (A) Requires periodic visits for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider; (B) Continues over an extended period of time (including recurring episodes of a single underlying condition); and (C) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.).

29 C.F.R. § 825.114(a)(2)(iii).  Absences attributable to incapacity under a chronic serious health

27

condition

> qualify for FMLA leave even though the employee . . . does not receive treatment
> from a health care provider during the absence, and even if the absence does not last
> more than three days.  For example, an employee with asthma may be unable to
> report for work due to the onset of an asthma attack or because the employee's health
> care provider has advised the employee to stay home when the pollen count exceeds
> a certain level.  An employee who is pregnant may be unable to report to work
> because of severe morning sickness.

29 C.F.R. § 825.114(e).

The burden of proof on a claim brought under the substantive rights provision of the FMLA lies with Schmutte, who must demonstrate by a preponderance of the evidence her eligibility for and her entitlement to the disputed leave.  *See Haefling v. United Parcel Serv., Inc.*, 169 F.3d 494, 499 (7th Cir. 2001)*; Diaz v. Fort Wayne Foundary Corp.*, 131 F.3d 711, 713 (7th Cir. 1997).  To prove that she has a chronic serious health condition, Schmutte must show by a preponderance of the evidence that her condition, depression and anxiety, required periodic visits to her health care providers and continued over an extended period of time with at least episodic incapacity.  29 C.F.R. § 825.114(a)(2)(iii).

A reasonable jury could find that Schmutte's depression and anxiety required periodic visits to her health care providers.  From July 2003, until Schmutte was admitted to St. Vincent's Stress Center, Schmutte was seeing both Dr. Beard and Ms. Benedict for her depression and anxiety.  Pl.'s Opp'n to Def.'s Mot. for Summ. J., p. 23-24 ("Pl.'s Opp'n").   Schmutte saw Dr. Beard on August 7, August 28, September 11, and October 9, 2003, for medication management and saw Ms. Benedict on July 8,  July 15, July 29, August 5, August 12, August 18, August 26, September 4, September 9, September 16, and September 23, 2003, for therapy sessions.  *Id.*  As a result of her depression and anxiety, Schmutte was admitted to the Stress Center on September 19, 2003, and was

28

not released until November 11, 2003. *Id.* During the time that Schmutte was admitted to the Stress Center, she was treated by psychiatrists and a therapist. *Id.* From the time Schmutte was released until the time she was terminated (approximately ten weeks), Schmutte saw her therapist eight times. *Id.* Based on this record, a reasonable jury could conclude that Schmutte's depression and anxiety required periodic visits to her health care providers.

A reasonable jury could also find that Schmutte's depression and anxiety continued over an extended period of time. Schmutte was treated for depression and anxiety and first took FMLA leave in July 2002. Pl.'s Opp'n, p. 24. In January 2004, Schmutte was still under medical treatment and still requesting FMLA leave because of her depression and anxiety. *Id.* Based on this record, a reasonable jury could conclude that Schmutte's depression and anxiety continued over an extended period of time.

Furthermore, a reasonable jury could find that Schmutte's depression and anxiety caused her periods of incapacity. Schmutte first took FMLA leave as a result of her depression and anxiety in July 2002. Pl.'s Opp'n, p. 24. Schmutte was out of work for three weeks as a result of her depression and anxiety. *Id.* From September 19, 2003, through November 11, 2003, Schmutte was in the Stress Center for depression and anxiety and was, therefore, unable to work for seven weeks. *Id.* From the time Schmutte returned to work on November 12, 2003, until her termination, Schmutte experienced four panic attacks that required her to leave work early. *Id.* Based on this record, a reasonable jury could conclude that Schmutte's depression and anxiety caused her periods of incapacity.

Thus, because Schmutte's anxiety and depression arguably required periodic visits to health care providers and arguably continued over an extended period of time with at least episodic

29

episodes of incapacity, a reasonable jury could find that Schmutte's depression and anxiety constituted a chronic serious health condition.

## 2. Notice to RCI

Notice is essential for FMLA claims, even for emergencies.  *See Collins*, 272 F.3d at 1008. If the need for FMLA leave is forseeable, such as when the leave is based on an expected birth, placement for adoption or foster care, or planned medical treatment for a serious health condition of the employee or of a family member, the employee must generally provide the employer at least thirty days advance notice before FMLA leave is to begin.  29 CFR § 825.302(a).  "If [thirty] days notice is not practicable, such as because of a lack of knowledge of approximately when leave will be required to begin, a change in circumstances, or a medical emergency, notice must be given as soon as practicable."  29 CFR § 825.302.  "As soon as practicable" ordinarily means at least verbal notification to the employer within one or two business days of when the need for leave becomes known to the employee.  *Id.*

> The employee need not expressly assert rights under the FMLA or even mention the FMLA . . . .  The employer should inquire further of the employee if it is necessary to have more information about whether FMLA leave is being sought by the employee, and obtain the necessary details of the leave to be taken.  In the case of medical conditions, the employer may find it necessary to inquire further to determine if the leave is because of a serious health condition and may request medical certification to support the need for such leave . . . .

*Id.*

Furthermore, when the need for FMLA leave is unforeseeable, the employee must give her employer notice "as soon as practicable under the facts and circumstances of the particular case[,]" usually within one or two workings days of learning for the need for leave.  29 C.F.R. § 825.303(a).

30

"In the case of a medical emergency requiring leave because of an employee's own serious health condition[,] . . . written advance notice pursuant to an employer's internal rules and procedures may not be required when FMLA leave is involved." *Id.*

Notice can be provided in person, by telephone, or by other means. 29 CFR § 825.303(b). The employee is not required to specifically invoke the protections of the FMLA or even mention the FMLA, but may only state that leave is needed; however, merely stating that one is sick is not enough to provide notice of a serious condition to an employer, such a statement could actually throw the employer off the trail of discovering FMLA leave is necessary. *Collins v. NTN-Bower Corp.*, 272 F.3d 1006, 1008-09 (7th Cir. 2001). Courts have held that "an employer with some prior knowledge of an employee's medical situation may not rely on an unspecific requests for FMLA leave to avoid the duty to inquire into whether the request is FMLA-qualifying." *Greenwald v. Tambrands, Inc.*, 366 F. Supp. 2d 195 (D. Me 2005) (quoting *Jennings v. Parade Publ'ns*, 2003 U.S. Dist. LEXIS 17088 at *4 (S.D.N.Y. 2003)). *See Barnett v. Revere Smelting & Refining Corp.*, 67 F. Supp. 2d 378, 386-87 (S.D.N.Y. 1999) (Although an employee disclosed in his notice of absence only that he had "chest pains" and "difficulty breathing," the employer's prior knowledge of an existing medical condition was relevant to determine whether the employer was on inquiry notice of a potentially FMLA-qualifying absence.); *Ware v. Stahl Specialty Co.*, No. 97 Civ. 0436, 1998 U.S. Dist. LEXIS 5506 (W.D. Mo. Apr. 9, 1998) (finding sufficient inquiry notice to employer where employee called in stating that he was sick with headaches, where employer had prior knowledge that employee was afflicted with migraines). Additionally, it is "not beyond the bounds of reasonableness to treat a dramatic change in behavior as notice of a medical problem." *Byrne v. Avon Prod., Inc.*, 328 F.3d 379, 381 (7th Cir. 2003). If a worker collapses, an employer might suspect a

31

serious condition. *Id.* "It would be silly to require the unconscious worker to inform the employer verbally or in writing." *Id.*

Because of Schmutte's verbal statements or because of RCI's prior knowledge of Schmutte's condition, a reasonable jury could conclude that at some point in November or December 2003, RCI either had notice that Schmutte may require additional FMLA leave or had a duty to seek additional information from Schmutte. The record shows that RCI knew Schmutte suffered from depression and anxiety as early as July 2002, when she was unable to work and went on FMLA leave. In September 2003, RCI learned that Schmutte had attempted suicide, that she suffered from depression for most of her life, and that she was already in therapy and taking medication for her depression. RCI also knew Schmutte was on FMLA leave from September 19, through November 11, 2003. When Schmutte returned to work after that FMLA leave, Schmutte told Ogborn that "she was not cured" and "needed additional treatment." Ogborn also noticed that Schmutte seemed down and was visibly upset at times. On November 23, Schmutte notified Team Leader Ogborn that she had to leave early because she was not feeling well. On December 1, Schmutte told Team Leader Ogborn that she was leaving early because she was having difficulty with job stress and having anxiety. On December 11, Schmutte again told Ogborn that she was leaving early because of job stress and anxiety. On December 22, Schmutte had to be wheeled out of work in an ambulance because she passed out as a result of her anxiety. On December 23, Schmutte returned to work, explained her collapse to Lanham, and inquired how she could protect her job. Shortly thereafter, Schmutte e-mailed Burtzlaff and explained the events of December 22. On December 30, Schmutte called TAP, explained the events of December 22, and said that she wanted to request FMLA leave. The above facts could lead a reasonable jury to conclude that Schmutte gave verbal notice to RCI that she might

require additional FMLA leave.  Additionally, a reasonable jury could conclude that RCI's prior knowledge of Schmutte's anxiety and depression could have imposed upon them a duty to inquire into whether Schmutte needed further FMLA leave.  There is no evidence in the record that anyone from RCI inquired as to whether Schmutte's absences in November or December were related to her anxiety or depression, even when Lanham discussed Schmutte's attendance points with her on December 2.

### 3.  **Denial of FMLA Leave**

RCI claims that Schmutte's FMLA request was properly denied because the medical certification forms submitted regarding Schmutte's condition were, according to RCI, either invalid or untimely.  An employer may require that FMLA leave requested under 29 U.S.C. § 2612(a)(1)(D) "be supported by a certification issued by the health care provider of the eligible employee."  29 U.S.C. § 2613(a).  An employee with an unforeseeable serious health condition has fifteen calendar days after the employer's request to submit a medical certification from his or her health care provider.  29 C.F.R. § 825.305(b).  A medical certification is sufficient if it states: (1) the date on which the serious health condition commenced; (2) the probable duration of the condition; (3) the appropriate medical facts within the knowledge of the health care provider regarding the condition; and (4) a statement that the employee is unable to perform the functions of the position of the employee. 29 U.S.C. § 2613(b); 29 C.F.R. § 825.306.  The FMLA certification does not require the disclosure of the dates on which the employee was seen by the health care provider, or the nature of treatment provided (in most circumstances), or allow the disclosure of the diagnosis.  Opinion Letter, U.S. DOL, FMLA-108, 2000 DOL FMLA LEXIS 1 at *3 (Apr. 13, 2000) (citing 29 C.F.R. §

33

825.306(b)(3); 60 Fed. Reg. 2180, 2222 (1995) (preamble to the final FMLA regulations)).

Under the regulations, if the employer "finds a certification incomplete," it must "provide the employee a reasonable opportunity to cure any such deficiency." 29 C.F.R. § 825.305(d); *Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 886 (7th Cir. 2005). "An incomplete certification is tantamount to an insufficient or inadequate certification or a certification that does not provide the information requested by the employer." *Jacks v. Conair Corp.*, 2006 U.S. Dist. LEXIS 42569 at *10 (C.D. Ill. 2006) (citing *Poteet v. Potter*, 2005 U.S. Dist. LEXIS 8658 at *21 (S.D. Ind. 2005)); *Shtab v. Greate Bay Hotel and Casino, Inc.*, 173 F. Supp. 2d 255, 264 (D. N.J. 2001) (citing *Marrero v. Camden County Bd. of Social Serv.*, 164 F. Supp. 2d 455, 466 (D. N.J. 2001)).

The only absence for which RCI sought a medical certification was for Schmutte's December 22, absence. The first certification form provided to RCI was filled out by Dr. Beard. It stated that Schmutte has anxiety and that she had an "acute episode" of anxiety on December 22, which caused her to go to the hospital. RCI argues that this certification form is invalid because the "absence plus treatment" box was marked and because Schmutte was not incapacitated for at least three days as required for a condition to qualify as "absence plus treatment." Def.'s Br. in Supp. of Summ. J., p. 13-14. Schmutte contends that the "absence plus treatment" box was marked only because CORE told Schmutte to do so. Pl.'s Opp'n, p. 28. Schmutte argues that she should have been granted an opportunity to correct the form and that because RCI and CORE had ample information concerning her psychological condition, they should not have been reviewing the certification form in a vacuum. Pl.'s Opp'n, p. 28.

RCI further asserts that the certification form was reviewed to see if the condition qualified under any of the other type of FMLA leave. D'Addario testified that Schmutte's condition did not

qualify as a "chronic condition requiring treatment" because "the doctor did not put down dates for follow-up treatment, did not put down the treatments, how many times, or any information like that . . . ." Dep D'Addario, p. 58-59. Schmutte argues that Dr. Beard's failure to include this information means "at best" that the certification was incomplete and that RCI was required to give Schmutte the opportunity to cure the deficiency.    Pl.'s Opp'n, p. 28 (citing *Kauffman,* 426 F.3d at 887 ("a failure to include duration in this case means at best that the form was incomplete")).

A reasonable jury could conclude that the medical certification form submitted by Dr. Beard provided notice that Schmutte's December 22, condition was an acute episode of anxiety requiring hospitalization, despite having the wrong box marked.   Alternatively, a reasonable jury could conclude that the form qualified as "incomplete" and that RCI was required to give Schmutte the opportunity to cure the deficiency.   Because a reasonable jury could find that Dr. Beard's certification form was valid or "incomplete" and that RCI's denial of Schmutte's leave was improper, it is unnecessary to address the validity and timeliness of the other two certification forms pertaining to Schmutte's condition and absence.

Because a reasonable jury could find that Schmutte was entitled to FLMA leave, that RCI had adequate notice of her entitlement, and that RCI improperly denied Schmutte FMLA leave, RCI's Motion for Summary Judgment on Schmutte's substantive FMLA claim is **DENIED**.

## B.  SCHMUTTE'S RETALIATION CLAIM

 The FMLA prohibits employers from discriminating or retaliating against employees who exercise their rights under the Act, and from interfering with an employee's attempt to exercise those rights.  29 U.S.C. § 2615(a); *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004).  As

discussed above, in the Seventh Circuit, a claim of FMLA retaliation is evaluated the same way as a retaliation claim under the Americans with Disabilities Act or Title VII, of the Civil Rights Act of 1964.  *See King v. Preferred Tech. Group*, 166 F.3d 887, 891 (7th Cir. 1999).  A plaintiff has two means of proving retaliation: the "direct method" and the "indirect method."  Schmutte has chosen to prove retaliation via the "direct method."

Under the direct method of proof, Schmutte must present direct evidence of (1) a statutorily-protected activity; (2) an adverse employment action taken by RCI; and (3) a causal connection between the two.  *See Rhodes v. Ill. DOT*, 359 F.3d 498, 508 (7th Cir. 2004); *Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002).  With respect to the concept of "causal connection," the Seventh Circuit has provided guidance on establishing a causal connection between the protected activity and the adverse employment action.  Close temporal proximity provides evidence of causation and may permit a plaintiff to survive summary judgment, provided there is other evidence that supports the inference of a causal link.  *Lang v. Ill. Dep't of Children & Family Serv.*, 361 F.3d 416, 419 (7th Cir. 2004).  Plaintiffs may proceed under the direct method provided that they adduce either direct evidence or circumstantial evidence that would entitle a jury to conclude that the employer acted because of the forbidden animus.  *Id*.

Under the direct method, there are three types of circumstantial evidence that can be used to establish discrimination or retaliation.  *See Troupe v. May Dep't Stores C*o., 20 F.3d 734, 736 (7th Cir. 1994).  According to the court in *Troupe*, To prove discrimination using circumstantial evidence, Schmutte must provide a "convincing mosaic of discrimination against [her]."[1]  *Id.* at 737.

_____

[1]The Court notes that at least one Circuit Court, *see Perkins v. Brigham & Women's Hosp.*, 78 F.3d 747 (1st Cir. 1996), *reh'g denied*, and several district courts, *see, e.g.*, *Schaffner v. Rush Presbyterian St. Luke's Hosp.*, No. 94 C 2471, 1996 WL 507246, at *5 n.8 (N.D. Ill. Sept. 4, 1996) (finding the facts before it should be analyzed under the framework in *McDonnell*

This "convincing mosaic" has been defined as three general types of evidence: (1) evidence of suspicious timing, ambiguous oral or written statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn; (2) evidence that employees similarly situated to the plaintiff other than in the characteristic on which an employer is forbidden to base a difference in treatment received systematically better treatment; and (3) evidence that the employer's stated reason for its actions is pretextual. *Id.* at 736-37.

The first element of Schmutte's direct method case, engaging in statutorily-protected activity, is met by the FMLA leave she took in September 2003, and arguably met by her request for leave in December 2003. With respect to the second element, Schmutte's termination qualifies as an adverse employment action. The parties dispute the third element—whether the two events had a causal connection.

A reasonable jury could conclude that there was a close temporal proximity between the time Schmutte returned from her FMLA leave on November 12, 2003, to the time that she was terminated on January 20, 2004. Schmutte was back to work only ten weeks before she was terminated. In addition, Schmutte was terminated twelve days after she submitted her first post-leave certification

---

*Douglas Corp. v. Green*, 411 U.S. 792 (1973), rather than that in *Troupe*); *Jones v. City of Elgin*, No. 96 C 6920, 1998 WL 259538, at *7-8 (N.D. Ill. May 13, 1998) (following *Schaffner*), have criticized the holding in *Troupe*. *Troupe* has not been overruled by the Seventh Circuit, however, and the facts of this case create a "mosaic of evidence" rather than an argument regarding pretext. The parties in this case also follow the circumstantial evidence approach in *Troupe*. The Court has determined that *Troupe* is the law, and the standards therein should apply to the facts of this case. *See also Paz v. Wauconda Healthcare & Rehab. Ctr., LLC*, 464 F.3d 659, 665 (7th Cir. 2006) (stating that "[a] Title VII plaintiff can avert summary judgment 'either by putting in enough evidence, whether direct or circumstantial, of discriminatory motivation to create a triable issue or by establishing a prima facie case under the *McDonnell Douglas* formula'" (quoting *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 719 (7th Cir. 2005) (citation omitted by Seventh Circuit)).

form.  Moreover, a reasonable jury could conclude that there is a mosaic of evidence indicating that because of Schmutte's use of FMLA leave, RCI was anxious to terminate Schmutte and failed to provide her with fair treatment.

As discussed above, a reasonable jury could conclude that sometime in November or December 2003, RCI had sufficient knowledge of Schmutte's condition to put RCI on notice that Schmutte would have future absences that were reasonably likely to qualify for FMLA leave. Likewise, a reasonable jury could conclude that when Schmutte left early on November 23, December 1, December 11, or December 22, 2003, RCI knew or should have known that these occurrences were caused by Schmutte's health condition and were eligible for FMLA-protected leave.  No one at RCI mentioned the FMLA in connection with the occurrences prior to the December 22, incident, and, taking the facts in the light most favorable to Schmutte, Lanham only reluctantly mentioned the FMLA after the December 22, occurrence.  On December 23, Schmutte asked Lanham what she should do about the absence to assure that she was protected as promised by Watts.  He said that he would "look into it."  He provided no information to Schmutte before the Christmas holiday and only mentioned that she should look into the FMLA when Schmutte again asked him what to do after the Christmas holidays.

Even before Schmutte's FMLA request was denied, Dickinson e-mailed Burtzlaff on January 7, to let her know that Schmutte called in sick, which, according to Dickinson, put Schmutte in negative points.  When CORE denied Schmutte's request for FMLA leave, Lanham, on January 13, 2004, e-mailed other managers that Schmutte would be terminated and stated, "But there is a new twist, she stated that Lea Watts told her that day she would not lose her job."  Dep. Jackson, p. 19, E4; Dep. Lanham, p. 66, E10.  Lanham also copied Binder, Dickinson, and Kathleen Kestner on the

e-mail.  Yet, when Binder met with Schmutte on January 20, none of the managers had checked with Watts to see if she had told Schmutte that she would not lose her job.  Although he had received Lanham's e-mail referencing the commitment by Watts, Binder professed ignorance when Schmutte raised Watts' commitment at the January 20, meeting.  Binder asked Schmutte if she had any witnesses to what Watts had said, and he said he would check with Watts.  Rather than staying the termination until he spoke with Watts, he terminated Schmutte anyway, and at his deposition, he admitted that he did not speak with Watts until "well after" Schmutte's termination.  Dep. Binder, p. 32-33.

The record shows that on January 12, 2004, the same day that Schmutte was orally notified of her FMLA denial, Burtzlaff also received notice of Schmutte's denial via e-mail.  The e-mail stated that Schmutte's request for FMLA leave was denied and that she or her manager could ask for an administrative review of the claim.  Burtzlaff was also notified of the deadline to request an administrative review.  Instead of notifying Schmutte of the right to administrative review, notifying her managers of their right to an administrative review, or asking for an administrative review based on her knowledge of Schmutte's condition, Burtzlaff did nothing.

When Schmutte learned that CORE denied her FMLA request, she immediately notified Lanham that she had been denied.  The next day Lanham notified Dickinson, Jackson, Ogborn, Kestner, and Binder that Schmutte had been denied.  None of them took any action.  Moreover, from the time her FMLA request was denied until the time of her termination, Schmutte approached Lanham and Ogborn repeatedly and asked what they knew about the status of her leave for the day she was taken to the hospital.  Lanham told Schmutte he would "look into it," and Ogborn "did not want to get involved."  When Schmutte told Binder that she did not know she could appeal her

FMLA denial, Binder terminated Schmutte instead of staying the termination pending the results of the appeal.

In summary, a reasonable jury could conclude that there is a close temporal proximity between Schmutte's termination and her FMLA requests and that there is a mosaic of evidence showing RCI's desire to terminate Schmutte. A reasonable jury could conclude that this is evidence of causation and that RCI was motivated to terminate Schmutte because she tried to exercise her FMLA rights. RCI's Motion for Summary Judgment on Schmutte's retaliation FMLA claim is **DENIED**.

## IV.  CONCLUSION

For the foregoing reasons, the Court finds that the Defendant's Motion for Summary Judgment on the Plaintiff's claims under the FMLA is **DENIED**.

IT IS SO ORDERED this 29th day of November, 2006.

LARRY J. McKINNEY, CHIEF JUDGE
United States District Court
Southern District of Indiana

Electronically distributed to:

Kimberly Denise Jeselskis
MACEY SWANSON AND ALLMAN
kjeselskis@maceylaw.com

Barry A. Macey
MACEY SWANSON AND ALLMAN
bmacey@maceylaw.com

Kim F. Ebert
OGLETREE, DEAKINS, NASH, SMOAK
  & STEWART
kim.ebert@ogletreedeakins.com

Bonnie L. Martin
OGLETREE, DEAKINS, NASH, SMOAK
  & STEWART
bonnie.martin@odnss.com